Paul F. HUMBERSTON and Carol J. Humberston, his wife, and James F. Humberston and Tennille L. Humberston, his wife, Appellants

v.

CHEVRON U.S.A., INC. and Keystone Vacuum, Inc., Appellees.

Superior Court of Pennsylvania.

Argued May 6, 2013.
Filed Aug. 20, 2013.

David C. Hook, Waynesburg, for appellants.

David R. Fine, Harrisburg, for Chevron, appellee.

John M. Polena, Pittsburgh, for Keystone Vacuum, appellee.

BEFORE: BENDER, J., GANTMAN, J. and OLSON, J.

OPINION BY BENDER, J.:

Paul F. Humberston, Carol J. Humberston, James F. Humberston and Tennille L. Humberston, (collectively "Appellants" or "Humberstons") appeal from the July 23, 2012 order that sustained the preliminary objections filed by Chevron U.S.A., Inc. ("Chevron") and Keystone Vacuum, Inc. ("Keystone") and dismissed Appellants' complaint with prejudice. We affirm.

The Humberstons own approximately 133 acres of land in Fayette County. On April 6, 2006, they entered into a gas and oil lease ("Lease") with the Keeton Group, LLC. Subsequently, Chief Exploration & Development LLC ("Chief") became the successor in interest to the Keeton Group and, thereafter, Chevron became the successor in interest to Chief. Keystone is a contractor that performed construction work for Chevron involving the freshwater-storage impoundment covering 11 acres of the Humberstons' property that is central to the issue in this matter. The freshwater-storage impoundment provided for the storage of fresh water to be used to develop the gas wells [1] on the Humberstons' property and other wells in the Humberston Unit.[2]

---

1. The natural gas wells involved in the instant case produce gas from Marcellus shale. Large amounts of fresh water are required to mine the natural gas from formations like the Marcellus shale strata.

2. The Lease provides for a "pooling" or "combining" of the Humberstons' property

The Humberstons filed an action to quiet title and in trespass on September 16, 2011, alleging that the freshwater-storage impoundment was not contemplated by the parties at the time the Lease was executed, that the Lease does not grant Chevron the right to construct the impoundment, and that the impoundment improperly intends to serve potential wells on other properties. The Humberstons requested the court to "enter a decree indicating that [Chevron and Keystone] have no right to build a large fresh water impoundment on the Humberston[s'] Subject Land." *See* Complaint. They also seek an award of actual and punitive damages. *Id.*

The Lease that is at the heart of this matter includes a Leasing Clause and a Unitization Clause, both of which are pertinent to the issues raised in this case. The Leasing Clause states:

> *LEASING CLAUSE:* Lessor hereby leases exclusively to Lessee all the oil, gas and coal bed methane and their constituents, whether hydrocarbon or non-hydrocarbon, underlying the land herein leased, **together with such exclusive rights as may be necessary or convenient for Lessee, at its election, to explore for, develop, produce, measure, and market production from the Leasehold, and from adjoining lands, using methods and techniques which are not restricted to current technology,** including the right to conduct geophysical and other exploration tests; to drill, maintain, operate, cease to operate, plug, abandon, and remove wells; to use or install roads, electric power and telephone facilities, and to construct pipelines with appurtenant facilities, including data acquisition, compression and

collection facilities **for use in the production and transportation of products from the Leasehold and from neighboring lands across the leasehold,** and such right shall survive the term of this agreement for so long thereafter as operations are continued, to use oil, gas, and non-domestic water sources, free of cost, to store gas of any kind underground, regardless of the source thereof, including the injection of gas therein and removing same therefrom, to protect stored gas, to operate, maintain, repair, and remove material and equipment.

Lease—Leasing Clause (emphasis added). The Lease also contains the following language in the Unitization Clause:

> *UNITIZATION:* **Lessor grants Lessee the right to pool, unitize, or combine all or part of the Leasehold with other lands, whether contiguous or not contiguous, leased, or un-leased, whether owned by Lessee or by others, at a time before or after drilling to create drilling or production units either by contract right or pursuant to governmental authorization.** Lessee is granted the right to change the size, shape and conditions of operations or payment of any unit created. Lessor agrees to accept and receive out of the production of the revenue realized from production of such unit, such proportional share of the Royalty from each unit well as the number of leasehold acres included in the unit bears to the total number of acres in the unit. Otherwise, except for Free Gas, the drilling, operations in preparation for drilling, production from, or payment for Royalty, Shut–In Royalty, or Delay in Marketing for a well on such a unit shall have the

with other adjacent properties to form a larger drilling unit, which in this case is identified as the Humberston Unit.

same effect upon the terms of this lease as if the well were located on the Leasehold.

Lease—Unitization Clause (emphasis added).

The trial court's opinion provides some additional background information:

[Appellants] also allege in the complaint that on July 17, 2010[,] [the] Humberstons and lessee, Chief, entered into a [S]urface [D]amage [R]elease, attached as Exhibit #3 to [Appellants'] complaint. This exhibit provides, inter alia, for the payment by Chief to [Appellants] of $10,000.00, which "shall be payment in full for the location up to the initial impacted area as defined below and for any and all surface damages which may result on the location from operations performed by Chief, its contractors, successors or assigns." The "initial impacted area" was to be no larger than seven acres. The release also provides that if Chief deems it necessary to utilize more of the subject land, lessee agrees to obtain the consent of the surface owners, which consent shall not be unreasonably withheld or delayed, and pay the surface owners an additional consideration of $1500.00 per acre so expanded. The complaint also alleges that in January of 2011, Chief sought to enter into a surface lease for a freshwater impoundment site on the premises. No agreement was executed by [the] Humberstons relative to Chief's request for a freshwater impoundment site.

Trial Court Opinion (T.C.O.), 7/23/12, at 2–6.

In response to the Humberstons' complaint, Chevron and Keystone filed preliminary objections in the nature of a demurrer. *See* Pa.R.C.P. 1028(a)(4). In its preliminary objections, Chevron contended that the Lease provides for "the right to use the surface area to construct an impoundment in connection with the natural-gas development on the Humberstons' property." *See* Chevron's Preliminary Objections ¶ 7A. Chevron also asserted that Pennsylvania law recognizes that "an oil-and-gas lessee has the implied right to access and use the surface area as reasonably necessary to develop the underlying oil and natural gas." *Id.* at ¶ 11. Therefore, Chevron alleges that the Humberstons cannot state a claim for relief. In its preliminary objections, Keystone likewise claims that the Humberstons failed to state a claim for relief, asserting specifically that the lease requires that arbitration be employed to settle disagreements and that the claims should be dismissed pursuant to the gist of the action doctrine. Both Chevron and Keystone further objected on the basis that the complaint failed to state a claim for punitive damages.

Following argument and the submission of briefs, the trial court sustained the preliminary objections and dismissed the Humberstons' complaint. The Humberstons now appeal to this Court, raising the following question for our review:

Should the Trial Court have dismissed the Complaint on a demurrer raised by preliminary objections?

Appellants' brief at 2. This general question encompasses the following seven subsidiary questions the Humberstons list in their brief:

1. Does the "exclusive rights" language in the oil and gas lease stating "together with such exclusive rights as may be necessary or convenient for lessee, in its election, to explore for, develop, produce ... from the Leasehold, and from adjoining land using methods and techniques which are not restricted to current technology, including the right to ... drill, maintain (and) operate ...

wells. . . ." provide the Lessee the right to build an eleven (11) acre water impoundment on the Lessors' surface property?

2. If the "exclusive rights" language requires interpretation, is that properly done by the fact-finder after a full trial?

3. Did the surface Damage Release limit express and implied rights under the oil and gas lease?

4. Are express and implied surface rights limited to the development of the property subject to the oil and gas lease?

5. Were horizontal drilling and large water impoundments in the contemplation [ ] of the parties when negotiating the oil and gas lease in 2006?

6. Was the course of dealings between the parties evidence there was no right to build a large water impoundment?

7. Are implied mining rights limited by reasonability and necessity?

*Id.*[3]

 Because this appeal stems from the grant of preliminary objections, we are guided by the following:

In determining whether the trial court properly sustained preliminary objections, the appellate court must examine the averments in the complaint, together with the documents and exhibits attached thereto, in order to evaluate the sufficiency of the facts averred. The impetus of our inquiry is to determine the legal sufficiency of the complaint and whether the pleading would permit recovery if ultimately proven. This Court will reverse the trial court's decision regarding preliminary objections only where there has been an error of law or abuse of discretion. When sustaining

the trial court's ruling will result in the denial of [a] claim or a dismissal of suit, preliminary objections will be sustained only where the case is free and clear of doubt.

*Floors, Inc. v. Altig,* 963 A.2d 912, 915 (Pa.Super.2009) (quoting *Cornerstone Land Development Co. of Pittsburgh LLC v. Wadwell Group,* 959 A.2d 1264, 1266–1267 (Pa.Super.2008) (citations omitted)). "Moreover, when considering a motion for a demurrer, the trial court must accept as true 'all well-pleaded material facts set forth in the complaint and all inferences fairly deducible from those facts.'" *Yocca v. Pittsburgh Steelers Sports, Inc.,* 578 Pa. 479, 854 A.2d 425, 436 (2004).

Furthermore, a lease is in the nature of a contract and is controlled by principles of contract law. *J.K. Willison v. Consol. Coal Co.,* 536 Pa. 49, 54, 637 A.2d 979, 982 (1994). It must be construed in accordance with the terms of the agreement as manifestly expressed, and "[t]he accepted and plain meaning of the language used, rather than the silent intentions of the contracting parties, determines the construction to be given the agreement." *Id.* (citations omitted). Further, a party seeking to terminate a lease bears the burden of proof. *See Jefferson County Gas Co. v. United Natural Gas Co.,* 247 Pa. 283, 286, 93 A. 340, 341 (1915).

*T.W. Phillips Gas and Oil Co. v. Jedlicka,* 615 Pa. 199, 42 A.3d 261, 267 (2012). Additionally, we recognize the following principles:

The interpretation of any contract is a question of law and this Court's scope of review is plenary. Moreover, "[w]e need not defer to the conclusions of the

---

**3.** We note that the Humberstons' issues do not raise questions regarding their trespass

claim or their request for punitive damages.

trial court and are free to draw our own inferences. In interpreting a contract, the ultimate goal is to ascertain and give effect to the intent of the parties as reasonably manifested by the language of their written agreement." When construing agreements involving clear and unambiguous terms, this Court need only examine the writing itself to give effect to the parties' understanding. This Court must construe the contract only as written and may not modify the plain meaning under the guise of interpretation.

*Szymanowski v. Brace*, 987 A.2d 717, 722 (Pa.Super.2009) (quoting *Abbott v. Schnader, Harrison, Segal & Lewis, LLP*, 805 A.2d 547, 553 (Pa.Super.2002) (internal citations omitted)). "The task of interpreting a contract is generally performed by a court rather than by a jury. The goal of that task is, of course, to ascertain the intent of the parties as manifested by the language of the written instrument." *Maguire v. Ohio Casualty Ins. Co.*, 412 Pa.Super. 59, 602 A.2d 893, 894 (1992).

Specifically, Appellants argue that the term "exclusive rights" is so vague and ambiguous that the intent of the parties cannot be ascertained from the language of the Lease. Therefore, Appellants contend that parol evidence is necessary to interpret the "exclusive rights" language of the Lease and that that determination becomes a question for the fact-finder, *i.e.*, a jury. Also as part of this argument, Appellants rely on the Surface Damage Release, discussed by the trial court in its opinion. Appellants claim that the Release, which refers to the 2006 Lease and to their property, "defines what activities can occur on the surface, obtains the Humberstons' consent and pays for that consent." Appellants' brief at 15. Thus, they appear to be arguing that because the fresh water impoundment is not included as one of the activities listed in the Re-

lease, that activity is prohibited and that by implication is not an allowed activity under the Lease.

Appellants further contend that ownership of the mineral rights only gives surface rights that are limited to developing the mineral underneath the surface. Appellants also note that at the time the 2006 Lease was negotiated, no horizontal Marcellus shale wells were being drilled in Fayette County, thus there was no need to develop large fresh water impoundments. Appellants therefore claim that this "new technology" was not contemplated at the time the lease was signed and that "[t]here was no possibility that the parties to this lease contemplated such a large surface use." Appellants' brief at 18.

Noting that the Lease is to be interpreted under contract law, the trial court explained that:

Following a thorough review of the Oil and Gas Lease, this [c]ourt finds that the language contained in the [L]ease is clear and unambiguous. The [L]ease clearly provides that the lessee has the right to use as much [of] the surface as is "necessary or convenient" to lessee to explore for, develop and produce oil and gas. The [L]ease also provides that lessee, in its efforts to explore for, develop and produce oil and gas from the subject premises and from lands which adjoin the subject premises, may use "methods and techniques which are not restricted to current technology."

[Appellants] argue that hydrofracking was unheard of, that the process had not been utilized in Fayette County prior to the date of the execution of the subject [L]ease and, therefore, could not have been a foreseeable or contemplated method to be utilized in the recovery of gas from the subject premises. It should now be obvious to any resident of

this Commonwealth that hydrofracking is a commonly used process for the production of natural gas from the Marcellus shale seam. The [L]ease executed by [Appellants] does not limit the production of gas to methods which existed and were utilized in 2006. The language of the [L]ease is clear and proves that lessee is permitted to take advantage of improvements in the industry as they develop. The [L]ease does not place any limitation upon the depth of the wells drilled or stratum of earth to be penetrated.

Furthermore, we do not find hydrofracking to be a new and novel method for the recovery of natural gas. Hydraulic fracturing of the strata to stimulate recovery of natural gas has been utilized in the drilling industry for many years. As noted by our Supreme Court in *United States Steel Corporation v. Hoge*, 503 Pa. 140, 468 A.2d 1380 (1983), the use of hydrofracking to stimulate gas recovery was developed by the drilling industry in the late 1940's. 468 A.2d at 1382 fn. 1. In *Hoge*, [the] lessee began drilling wells in 1978 to the 9–foot or Pittsburgh vein of coal with the intention of stimulating the recovery of coalbed methane gas through the hydrofracking process. The leased premises in the *Hoqe* [*Hoge* ] case is situate in Greene County which adjoins Fayette County to the west.

Additionally, the law of this Commonwealth is that one who has the right to remove subsurface minerals, also has the right to enter onto the surface and to make reasonable use of a portion of the surface to retrieve his property. *Belden and Blake Corporation v. Department of Conservation and Natural Resources*, 600 Pa. [559] 599, 969 A.2d 528 (2009). In *Belden and Blake*, the Pennsylvania Supreme Court held that the case in *Chartiers Block Coal Company v. Mellon*, 152 Pa. 286, 25 A. 597 (1893)[,] remains the seminal case setting forth a subsurface owner's rights with respect to the surface owner's rights. [*Belden*], 969 A.2d [at] 532 fn. 6. In *Chartiers*, the court held that:

> As against the owner of the surface, each of the several purchasers [of subsurface rights] would have the right, without any express words of grant for that purpose, to go upon the surface to open a way by shaft, or drift, or well, to his underlying estate, and to occupy so much of the surface, beyond the limits of his shaft, drift, or well, as may be necessary to operate his estate, and to remove the product thereof.

*Chartiers Block Company v. Mellon*, 25 A. at 598.

The Supreme Court has also held that it is a general rule of law that, when anything is granted, all the means of attaining it and all the fruits and effects of it are also granted; when uncontrolled by express words of restriction all the powers pass which the law considers to be incident to the grant for the full and necessary enjoyment of it. *Oberly v. H.C. Frick Coke Company*, 262 Pa. 83, 104 A. 864 (1918). Consequently, a grant or a reservation of mines gives the right to work them, to enter and to mine, unless the language of the grant itself provides otherwise or repels this construction.

The bare right to work carries with it the right to use so much of the surface as is reasonably necessary. *Id.* The mine owner has the right to enter and take and hold possession even as against the owner of the soil, and to use the surface so far as may be necessary to carry on the work of mining, even to the exclusion of the owner of the soil. *Id.*

In the present case Chevron as[ ] assignee of Chief, has the exclusive right to recover the natural gas underlying the Humberston property. As the owner of the right to enter and recover the natural gas Chevron has the right to use the surface of the Humberston property so far as may be necessary to explore for, develop and produce natural gas from the Humberston property. Plaintiffs also granted to Chevron exclusive rights as may be "necessary or convenient".

To produce the natural gas and maximize production from the Marcellus shale, Chevron must utilize hydraulic fracturing of the seam of shale. This process requires the use of significant quantities of water. Temporary impoundment of water on the surface of the leased premises is reasonably necessary for the hydrofracking process and, therefore, is incident to the grant. This [c]ourt finds that [the] Humberstons' right to the portion of the surface occupied by the impoundment is subordinate to Chevron's and that the complaint fails to state a claim upon which relief may be granted by this [c]ourt. [Chevron's and Keystone's] preliminary objections filed pursuant to Pa.R.C.P. 1028(a)(4) must be sustained.

T.C.O. at 9–14.

■ We agree with the trial court's conclusions and its reasoning. The language of the Lease and Pennsylvania law allow for the use of the surface area of the property as is reasonably necessary or convenient to develop the natural gas under the Humberstons' property and that of property constituting the Humberston Unit. There is no apparent ambiguity or vagueness in the language of the Lease. Moreover, we note that the Humberstons do not allege that the fresh water impoundment is unnecessary to the extraction of gas from the Marcellus shale strata. Accordingly, without contradictory language in the Lease, parol evidence that the Humberstons seek to introduce to a jury is not admissible. *See Yocca*, 854 A.2d at 435–36 (stating "[o]nce a writing is determined to be the parties' entire contract, the parol evidence rule applies and evidence of any previous oral or written negotiations or agreements involving the same subject matter as the contract is almost always inadmissible to explain or vary the terms of the contract."). The Lease also contains an integration clause, which states "[t]he entire agreement between Lessor and Lessee is embodied herein. No oral warranties, representation, or promises have been made or relied upon by either party as an inducement to or modification of this Lease." Lease—Entire Contract. This clause further supports the fact that the Lease represents the entire agreement between the parties, resulting in the inadmissibility of parol evidence.

■ As for the Surface Damage Release, it is a separate agreement that provided for payment to the Humberstons for damage to the initial drilling area. The Release does not incorporate the Lease and therefore cannot limit in any way the use of the surface as contemplated in the Lease. Likewise, the unexecuted surface lease referenced by the trial court in its opinion does not affect the Lease at issue here. It was an attempt by Chevron's predecessor to have the Humberstons agree to the use of the fresh water impoundment for developing wells *outside* of the Humberston Unit. In fact, the Humberstons acknowledge this fact in Exhibit 5, which is attached to their complaint. *See* Complaint ¶ 14, Exhibit 5 (stating that the unsigned agreement "would have permitted Chief to utilize its planned impoundment ... for fracture stimulating wells which Chief has planned for lands in

the vicinity of the Humberston leased premises but outside the boundaries of the Humberston Unit."). Moreover, the express language of the Lease provides for the use of "methods and techniques ... not restricted to current technology[.]" Lease—Leasing Clause. *Compare Heidt v. Aughenbaugh Coal Co.*, 406 Pa. 188, 176 A.2d 400, 402–03 (1962) (reasoning that language of lease expressly provided for the employment of "all practical methods now [1915] in use, or which may hereafter be used").

■ Finally, the Humberstons' allege that the court usurped the jury's function by granting Chevron's and Keystone's preliminary objections. As noted previously, it is the court's rather than the jury's duty to interpret a contract. This interpretation is a question of law. *See Szymanowski, supra.* Thus, whether to grant or deny the preliminary objections was properly a decision for the court. Moreover, our review of the Humberstons' complaint with the attached documents, including the Lease, reveals that the facts, even when accepted as true, are insufficient to provide them relief. Accordingly, we affirm the trial court's order sustaining the preliminary objections and dismissing the complaint with prejudice.

Order affirmed.