J-A26036-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| ATLANTIC COMMUNITY BANKERS BANK, INC., AND JON EVANS | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellees | |
| v. | |
| CHARLES DANIELS AND IMRAN DALVI | |
| Appellants | No. 635 MDA 2014 |

Appeal from the Order Entered March 20, 2014
In the Court of Common Pleas of Cumberland County
Civil Division at No(s): 14-250

BEFORE:  BOWES, J., MUNDY, J., and JENKINS, J.

MEMORANDUM BY JENKINS, J.:                    **FILED MARCH 18, 2015**

Charles Daniels and Imran Dalvi filed an action in the American Arbitration Association against Atlantic Community Bankers Bank ("ACBB") and Jon Evans, ACBB's president and CEO, for unjust enrichment and breach of New Jersey's Conscientious Employee Protection Act ("CEPA").[1]  ACBB and Evans filed a petition to stay arbitration in the Court of Common Pleas of Cumberland County ("lower court").  The lower court granted the petition and entered an order permanently staying arbitration, and Daniels and Dalvi

---

[1] N.J.S.A. 34:19–1 *et seq*.  CEPA, New Jersey's whistleblower act, protects employees from retaliation for, *inter alia*, disclosing or threatening to disclose to a supervisor or to a public body any activity, policy or practice of the employer that the employee reasonably believes is criminal or fraudulent.

filed a timely appeal to this Court. Daniels and Dalvi have complied with Pa.R.A.P. 1925, as has the lower court. After careful review, we affirm.

We begin by sketching the proper standard of review. The Uniform Arbitration Act, 42 Pa.C.S. § 7301 *et seq*., provides in relevant part that "[o]n application of a party to a court to stay an arbitration proceeding threatened or commenced the court may stay an arbitration on a showing that there is no agreement to arbitrate." 42 Pa.C.S. § 7304(b). In an appeal from an order enjoining arbitration, we review whether a valid arbitration agreement was entered into and, if so, whether the agreement covers the dispute in question. *PBS Coal, Inc. v. Hardhat Mining, Inc.*, 632 A.2d 903, 905 (Pa.Super.1993); *see also Sanitary Sewer Authority of the Borough of Shickshinny v. Dial Associates Construction Group, Inc.*, 532 A.2d 862, 863 (Pa.Super.1987) ("[I]n determining whether such an arbitration stay request should be granted, a court must limit its inquiry to the question of whether the parties agreed that the claim would be determined by arbitration"). The interpretation of an arbitration agreement, like the interpretation of any contract, is a question of law, so we need not defer to the conclusions of the trial court and are free to draw our own inferences. *Humberston v. Chevron U.S.A., Inc.*, 75 A.3d 504, 509-10 (Pa.Super.2013).

The allegations[2] underlying this dispute are as follows: ACBB is a "bankers bank", i.e., a bank owned by 350 smaller banks that have pooled their resources into one large bank.[3] Daniels and Dalvi have experience in working with telecommunications and technology startups.[4] Evans spoke with Daniels and Dalvi about creating a business plan for a telecommunications company that would be a subsidiary of ACBB and would supply ACBB's community banks with converged networking and IP telephone technologies.[5] Daniels and Dalvi determined that they could

_____

[2] We should emphasize that this appeal only involves a question of law as to the appropriate forum for Daniels' and Dalvi's claims against ACBB and Evans. We do not accept as true any of the parties' factual allegations concerning the parties' backgrounds or conduct. We summarize the parties' allegations only to provide additional context for our decision on the question of law before us. It remains for the trier of fact on remand to determine which factual allegations to accept concerning the parties' background and conduct.

[3] Petition Of ACBB and Evans For Stay Of Arbitration ("ACBB Petition"), ¶ 7; Answer of Daniels and Dalvi to ACBB Petition ("Answer"), ¶ 7.

[4] Memorandum Of Daniels and Dalvi In Support Of Answer To ACBB Petition ("Memorandum"), p. 2.

[5] Memorandum, p. 2. Daniels and Dalvi allege that ACBB was interested in their services for two reasons:

> At the time, national banks such as Bank of America had begun to experience significant savings in networking and telecommunications costs by keeping these services in house. It was intended that the proposed subsidiary [the entity in which Daniels and Dalvi would provide services to the Bank] would help ACBB's community banks to realize similar savings.

*(Footnote Continued Next Page)*

devise an in-house networking system that would create significant savings for ACBB's community banks, and they presented their business plan to ACBB's Board of Directors.[6] The Board approved the formation of a telecommunications subsidiary, ACBB-BITS, LLC ("BITS"), to implement Daniels' and Dalvi's business plan.[7] Pennsylvania's Department of Banking approved the formation of BITS.[8]

Several documents were then executed: an operating agreement between ACBB and BITS, and employment agreements between Daniels and Dalvi on one hand and BITS on the other. We review these documents below.

_(Footnote Continued)_ ────────────

> Additionally, by selling networking and telecommunications services through the subsidiary, ACBB hoped to develop a steady stream of revenue to supplement the revenue from the commercial lending prong of its business.

Brief For Appellants, p. 8.

[6] Memorandum, p. 2.

[7] Memorandum, p. 2. According to Daniels' and Dalvi's brief on appeal, Pennsylvania's Department of Banking approved the formation of BITS, but we do not see any support for this claim in the record. This omission, however, does not affect our ability to decide the central issue of whether this dispute belongs in arbitration or in the trial court.

[8] Daniels and Dalvi's Complaint, Court of Common Pleas of Cumberland County ("Complaint"), ¶¶ 18-23.

BITS' **operating agreement** with ACBB states on the first page that ACBB is BITS' managing member[9] but later refers to Evans as BITS' managing member.[10] This minor discrepancy is immaterial to whether the present case belongs in arbitration. For convenience, we will refer to Evans as BITS' managing member. The operating agreement provides that at the close of each fiscal year, Evans, as BITS' Managing Member, must distribute 90% of BITS' annual net income in cash on a pro rata basis to each BITS member while keeping 10% of annual net income in reserve for BITS.[11]

Daniels' and Dalvi's **employment agreements** (1) designate Daniels and Dalvi as BITS' CEO and CFO, respectively, (2) make Daniels and Dalvi employees of BITS, not ACBB,[12] and (3) designate Evans as BITS' managing member.[13] Each employment agreement states that any amendment to the

---

[9] Operating Agreement, p. 1.

[10] Operating Agreement, p. 11.

[11] Operating Agreement, p. 11.

[12] Daniels Employment Agreement, pp. 2, 5; Dalvi Employment Agreement, pp. 2, 4.

[13] Daniels Employment Agreement, p. 4; Dalvi Employment Agreement, p. 4.

90-10% arrangement spelled out in the operating agreement would constitute constructive termination of Daniels and Dalvi.[14]

Each employment agreement expressly designates ACBB as a third-party beneficiary and authorizes ACBB to enforce any provisions that are applicable to ACBB.[15]   ACBB receives numerous benefits under each employment agreement, e.g., covenants prohibiting BITS from (1) disclosing confidential information; (2) soliciting clients, employees, officers, and agents; and (3) competing with ACBB.[16]   Furthermore, each agreement provides that Daniels and Dalvi will receive the same health, pension and fringe benefits that ACBB provides to its own management.[17]

Finally, each employment agreement includes the following arbitration clause: "Any dispute or controversy arising out of or relating to this agreement or any claimed breach thereof shall be settled, at the request of

---

[14] Daniels Employment Agreement, p. 3; Dalvi Employment Agreement, pp. 2-3.

[15] Daniels Employment Agreement, p. 13; Dalvi Employment Agreement, p. 13.

[16] Daniels Employment Agreement, pp. 8-9; Dalvi Employment Agreement, p. 8-9.

[17] Daniels Employment Agreement, p. 7; Dalvi Employment Agreement, p. 7.

either party, by an arbitration proceeding conducted in accordance with the rules of the [American Arbitration Association]. . ."[18]

On or about March 1, 2005, Daniels and Dalvi signed their respective employment agreements, and Evans signed each agreement both on behalf of ACBB and as BITS' Managing Member.[19]

In December 2010, ACBB's board of directors voted to change the 90-10% arrangement from a requirement to a target.[20] Daniels and Dalvi told Evans that they intended to exercise their right of constructive termination if ACBB did not rectify this issue.[21] Evans asked Daniels and Dalvi to give ACBB time to rectify the problem. Through several amendments to the operating agreement, Daniels and Dalvi agreed to extend the constructive termination deadline to May 22, 2013.[22]

On March 1, 2013, Daniels told a Board member that he believed that ACBB's management of BITS constituted a breach of ACBB's representations

---

[18] Daniels Employment Agreement, p. 14; Dalvi Employment Agreement, pp. 13-14.

[19] Daniels Employment Agreement, p. 16; Dalvi Employment Agreement, p. 16.

[20] Complaint, ¶ 98.

[21] Complaint, ¶ 103.

[22] Complaint, ¶¶ 100-110.

to bank regulators at the time ACBB sought approval to form BITS.[23] Specifically, Daniels said that loans from ACBB to BITS exceeded BITS' debt limit, thus subjecting ACBB to regulatory penalties and liability.[24] ACBB agreed to a meeting to discuss this issue, but instead of holding the meeting, it issued letters of termination to Daniels and Dalvi.[25]

On December 6, 2013, Daniels and Dalvi filed the aforementioned action against ACBB and Evans in the American Arbitration Association.[26] Daniels and Dalvi alleged that ACBB violated CEPA by terminating them in retaliation for declaring their intent to report ACBB's violations of banking regulations.[27] Daniels and Dalvi further alleged that ACBB was liable for unjust enrichment because ACBB retained profits that it was supposed to pass on to Daniels and Dalvi.[28]

_____

[23] Daniels' and Dalvi's AAA Arbitration Demand ("Arbitration Demand"), p. 12.

[24] Arbitration Demand, pp. 11-12.

[25] Arbitration Demand, pp. 12-13.

[26] It appears that Daniels and Dalvi demand recovery under CEPA on the ground that they worked in New Jersey and were protected by New Jersey law. ACBB and Evans have not asserted that Pennsylvania courts lack subject matter jurisdiction over the CEPA claim.

[27] Arbitration Demand, pp. 14-16.

[28] Arbitration Demand, pp. 16-18. To elaborate, Daniels and Dalvi alleged:
*(Footnote Continued Next Page)*

BITS was created so that ACBB could supplement its volatile commercial lending revenue stream with a more stable source of income, and this goal has been accomplished as BITS is generating more profits each year, including a gross profit of over $7,000,000 in 2012 that yielded a positive net income of over $700,000. The early success of BITS was dependent upon its unique interdependent structure whereby savings and profits were intended to adhere largely to BITS customers, employees, and shareholders.

Once it became clear to ACBB that the BITS model was going to succeed, ACBB immediately set about altering the founding vision of the company so that it could retain profits for itself rather than pass savings and revenue to the intended parties. First, in 2006, ACBB significantly reduced the number of Class A membership units available for sale from 2,500,000 to 1,500,000 and then changed the parameters of the agreement again in 2007 when it decided to fund BITS with debt instead of capital in contravention of the Letter of Non-Objection and the Operating Agreement. Funding BITS with debt allowed ACBB to hoard membership units that it otherwise would have sold and also laid the groundwork for the 2009/2010 amendments to the Operating Agreement. Pursuant to these amendments, ACBB was able to avoid paying bonuses and distributions to shareholders and employees that by prioritizing the repayment of loans that it improperly made to BITS. During this period, ACBB also was able to use its loan as a tax deduction while collecting more than $1,000,000 in principle and interest payments from BITS from 2009 through 2012. . .

There is little justice in the retention by ACBB of the significant monetary benefits it received as a result of its own decision to put over $4,600,000 of debt into BITS and its subsequent unilateral action to prioritize repayment of this debt at the expense of

*(Footnote Continued)* ⎯⎯⎯⎯⎯⎯⎯⎯⎯

the BITS employees and members. BITS was created, and its success depended upon, the interdependent model whereby the customers and employees that took on risk and used their expertise to make the company profitable would be rewarded for their efforts and loyalty. The top talent that BITS was able to attract was wholly the result of this model, and ACBB's persistence in undermining this model to its own benefit constitutes unjust enrichment.

Additionally, by firing [Daniels and Dalvi], ACBB has set itself up to recoup the 600,000 membership units owned by Mr. Dalvi and the 2,500,000 membership units owned by Mr. Daniels in 2015 and 2017, respectively. Despite the fact that Claimants accepted their positions at BITS for below-market salaries based on the promise of receiving bonuses and distributions once the company became profitable, ACBB's postponement of BITS profitability resulted in a scenario where Claimants held the membership units when they were basically worthless and ACBB will take them back at the precise time at which the units will begin to yield substantial distributions of annual net income.

Mr. Daniels and Mr. Dalvi built a successful and profitable company for ACBB. While it was always contemplated that ACBB would realize a profit from the BITS operation, ACBB's willingness to deceive the regulators, BITS executives, and employees, has caused it to recognize a profit that has been and will be significantly larger than its intended share.

Arbitration Demand, pp. 16-18.

On January 14, 2014, ACBB and Evans filed a petition to stay arbitration in the lower court. On March 20, 2014, the lower court ordered a permanent stay of arbitration on the ground that ACBB and Evans were not parties to Daniels' or Dalvi's employment agreements with BITS and therefore were not subject to the arbitration clauses in these agreements. The court reasoned:

> ACBB and Evans are not parties to the respective Employment Agreements between [BITS], Charles Daniels, and lmran Dalvi. . .ACBB and Evans have not agreed to arbitrate the disputes set forth in the Arbitration Demand, and. . .the disputes in the Arbitration Demand are not within the scope of the arbitration provisions of the aforementioned Employment Agreements. Each Employment Agreement includes ACBB only as a third-party beneficiary, while Evans only signed each document in his official capacity as an agent of the respective entity. Neither [ACBB nor Evans] [is] included as a party to the Employment Agreement, which is expressly between [BITS], LLC, and [Daniels and Dalvi]. Finally, the Arbitration Demand involves claims by [Daniels and Dalvi] against [ACBB and Evans] who, as non-parties to the contract, are not beholden to the obligations of the contract.

Trial Court Opinion, p. 2. This appeal followed.[29]

---

[29] After filing this appeal, Daniels and Dalvi filed a writ of summons in the lower court against ACBB and Evans. Subsequently, Daniels and Dalvi filed a complaint in the lower court alleging unjust enrichment and violation of CEPA. ACBB and Evans do not argue that the filing of a writ of summons and complaint moot this appeal. We have the discretion, but not the obligation, to raise the issue of mootness *sua sponte*. **Rendell v.**
*(Footnote Continued Next Page)*

Daniels and Dalvi raise three issues in this appeal:

1. Whether ACBB and Evans are parties to the Employment Agreements of Charles Daniels and Imran Dalvi and are thereby bound by the arbitration clause contained therein.

2. Whether ACBB and Evans are bound by the arbitration clause as third-party beneficiaries to the Employment Agreements.

3. Whether the claims set forth by Daniels and Dalvi in their Demand for Arbitration are within the scope of the arbitration clause contained in the Employment Agreements.

Brief For Appellants, p. 5. We find the third issue dispositive.

Based on the plain language of Daniels' and Dalvi's employment agreements, we agree with the lower court's order granting ACBB's and Evans' petition. "When construing agreements involving clear and unambiguous terms, this Court need only examine the writing itself to give effect to the parties' understanding. This Court must construe the contract only as written and may not modify the plain meaning under the guise of interpretation." *Humberston v. Chevron U.S.A., Inc.,* 75 A.3d 504, 509–10 (Pa.Super.2013).

Under the plain language of the employment agreements, Daniels and Dalvi may demand arbitration only for "[a] dispute or controversy arising out

(Footnote Continued) ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

*Pennsylvania State Ethics Commission*, 983 A.2d 708, 718 (Pa.2009). Since we conclude that the lower court's decision to stay arbitration was proper, we do not find it necessary to address the question of mootness.

of or relating to this agreement or any claimed breach thereof."[30] The CEPA count in Daniels' and Dalvi's arbitration demand falls well outside of this category. The CEPA count asserts that ACBB and Evans retaliated against Daniels and Dalvi for declaring their intent to report ACBB's violations of banking regulations. This count does not arise out of, relate to or claim a breach of covenants in the employment agreements that are intended to protect ACBB, i.e., covenants prohibiting BITS from (1) disclosing confidential information, (2) soliciting clients, employees, officers, and agents, and (3) competing with ACBB. Nor does this count arise out of, relate to or claim a breach of ACBB's duty under the employment agreements to provide Daniels and Dalvi with the same health, pension and fringe benefits that ACBB provides to its own management. Nor does this count implicate Evans, since he does not possess any rights or duties individually under the employment agreements.

Similarly, the unjust enrichment count in Daniels' and Dalvi's arbitration demand falls outside the scope of the arbitration clause. The unjust enrichment claim alleges that ACBB diverted profits to itself that should have gone to BITS and its executives, Daniels and Dalvi, under the *operating agreement* between ACBB and BITS. While this claim implicates

---

[30] Daniels Employment Agreement, p. 14; Dalvi Employment Agreement, pp. 13-14.

the operating agreement, it clearly does not involve "[a] dispute or controversy arising out of or related to [*the employment agreements*] or any claimed breach thereof. . ." Stated another way, this claim has nothing to do with the covenants in the employment agreements that protect ACBB or with ACBB's duty under the employment agreements to provide Daniels and Dalvi with health, pension and fringe benefits. Nor does this count implicate Evans, since he does not possess any rights or duties individually under the employment agreements.

In short, neither of the claims in Daniels' and Dalvi's arbitration demand are subject to arbitration. Daniels and Dalvi must bring these claims in the appropriate court of law. We express no opinion on whether the lower court is an appropriate forum for the parties' dispute, because we limit our focus to whether ACBB and Evans must submit to AAA arbitration.

Daniels and Dalvi rely on two decisions -- ***Miller v. Allstate Insurance Co.***, 763 A.2d 401 (Pa.Super.2000), and ***Highmark Inc. v. Hospital Service Association of Northeastern Pennsylvania***, 785 A.2d 93 (Pa.Super.2001) – for the proposition that ACBB must submit to arbitration. We find these decisions inapposite. ***Miller*** and ***Highmark*** hold that when an agreement (1) provides rights to a third-party beneficiary, and (2) provides that disputes relating to the agreement must go to arbitration, the third party beneficiary must proceed to arbitration *to enforce its own*

*rights* under the agreement.[31] This is because "a third-party beneficiary's rights and limitations in a contract are the same as those of the original contracting parties." **Miller**, **supra**, 763 A.2d at 405 n. 1. In this case, ACBB is not attempting to enforce its own rights under the employment agreements. Instead, Daniels and Dalvi attempt to prosecute claims *against* ACBB that *do not pertain to ACBB's rights* under the employment agreements (or, for that matter, to ACBB's duty to provide adequate benefits).[32]

_____

[31] In **Miller**, a passenger injured in a car accident sought compensation from the car owner's insurer as a third-party beneficiary to the car owner's policy. **Miller**, 763 A.2d at 402. The policy included an arbitration agreement that purported to extend the time for challenging an arbitration award in court beyond the time provided by statute. **Id**. at 404. This Court held that the arbitration agreement was unenforceable to the extent it conflicted with a Pennsylvania statute, because parties cannot expand a court's jurisdiction by contract. **Id**. We added a footnote that "[u]nder Pennsylvania law, a third-party beneficiary's rights and limitations in a contract are the same as those of the original contracting parties." **Id**. at 405 n. 1. Similarly, in **Highmark**, this Court held that a third-party beneficiary with rights under a contract could enforce the contract's arbitration clause. **Highmark**, 785 A.2d at 99. **See also Smay v. E.R. Stuebner, Inc.**, 864 A.2d 1266, 1272 (Pa.Super.2004) (third-party beneficiary that wanted to assert same claim as contracting party had to comply with same arbitration requirement, because that was contracting parties' intent).

[32] Moreover, even if ACBB were not a third-party beneficiary because it has duties under the employment agreements as well as rights, the result would be the same, because the subject matter of Daniels' and Dalvi's claims does not require arbitration under the plain language of the arbitration clause in the employment agreements.

For these reasons, the lower court properly enjoined Daniels and Dalvi from prosecuting an action against ACBB and Evans in the American Arbitration Association.

Order affirmed.

Judge Mundy joins the memorandum.

Judge Bowes files a dissenting memorandum.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/18/2015