J-A27013-15

2016 PA Super 80

| | |
|---|---|
| EARL D. HALL SR.; BETTY JANE HALL; AND EARL D. HALL, JR., ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellants | |
| v. | |
| CNX GAS COMPANY, LLC, IN ITS OWN RIGHT AND AS SUCCESSOR-IN INTEREST TO CONSOL GAS COMPANY, LLC | |
| Appellee | No. 1703 WDA 2014 |

Appeal from the Order October 7, 2014
In the Court of Common Pleas of Allegheny  County
Civil Division at No(s): GD 10-21633

BEFORE:  BOWES, OLSON, AND STABILE, JJ.

OPINION BY BOWES, J.:                    **FILED APRIL 07, 2016**

Earl D. Hall, Sr., Betty Jane Hall, and Earl D. Hall, Jr. (hereinafter "the Halls" or "Lessors") appeal from the October 7, 2014 order entered by the trial court that granted summary judgment in favor of CNX Gas Company (hereinafter "CNX" or "Lessee") and dismissed their claims.  After thorough review, we affirm.

The instant appeal involves the interpretation of an oil and gas lease. In March 1998, Earl Hall, Jr., leased the oil and gas rights on his Fayette County property to a predecessor company of CNX.  Earl, Sr. and Betty Hall leased the same rights in their real estate in October 2002.  The leases

contain nearly identical language throughout and specifically utilize the same royalty clause at issue in this matter. That provision reads:

> **3. Royalties** The royalties to be paid by the Lessee are:
>
> . . . .
>
> (b) <u>on gas</u>, including casinghead gas or other gaseous substance, produced from said land and sold or used beyond the well or for the extraction of gasoline or other product, an amount equal to one-eighth of the net amount realized by Lessee computed at the wellhead from the sale of such substances. On gas sold at the well, the royalty shall be one-eighth of the amount realized by Lessee from such sale.

Lease, Earl, Sr. and Betty Hall ("the Hall lease"), 10/23/02, at ¶ 3.[1]

As the provision states, when gas is sold at the Lessor's wellhead, Lessee pays one-eighth of the amount realized from that sale as royalty. However, the bulk of the gas is not sold at the wellhead but is transported via pipeline downstream[2] to the point of sale. The Hall lease provides that, for gas sold or used beyond the well, Lessor is entitled to a royalty of one-eighth of the net amount realized from the sale. This is generally referred to as a proceeds lease, and the parties agree that royalties are payable only on the gas sold. *See* Appellant's Reply Brief at 1.

---

[1] The fraction one-eighth is in compliance with Pennsylvania's Oil and Gas Lease Act. 59 P.S. § 33.3.

[2] The "downstream" segment refers to the final portion of the distribution chain, which typically begins after gathering and processing and concludes with the distribution or sale of the gas.

The two Hall properties are part of a system of wellheads and pipelines that feed into a gathering system. At various points along that pipeline, gas produced from other lessors' wells is commingled with that of the Halls and transported to the point of sale. The Hall lease conferred upon CNX the right to drill and operate the Halls' wells in conjunction with the wells on neighboring properties. *See* Hall lease at 1 ¶1(b)(granting to CNX "any and all other rights and privileges necessary, incident to, or convenient for the economical operation of the lands, alone or conjointly with neighboring lands for these purposes"). Significantly, the lease also gave Lessee the right "to use, free of cost, oil, gas and water produced on said land for its operations." *Id*. at ¶13.

It is undisputed that the Hall lease requires CNX to pay a one-eighth royalty to the Halls and the other lessors calculated upon the net amount realized at the point of sale. CNX allocates royalties among the lessors based on each lessor's proportionate contribution to the volume of gas as measured at the wellhead by the well meter. CNX succinctly described the calculation as follows:

> The royalty payment to each [lessor] is computed by dividing the volume of gas as measured at each well head by the total volume of gas measured at all of the wellheads that feed into the sales point. This value is multiplied by the amount realized on the sale by CNX to compute each well's proportionate share of the amount realized from the sale.

Appellant's brief at 8 n.1 (quoting CNX's Answer to Interrogatory No. 3, Plaintiff's Motion for Partial Summary Judgment as to Liability on Counts I and II of the Second Amended Complaint, Exhibit 1 at 2-3 ). Thus, if there are multiple lessors contributing gas to the system, CNX measures the volume of gas at each wellhead, and totals the volumes. For purposes of illustration, we assume that the total volume produced is 10,000 units. If Earl, Sr. and Betty Jane's well contributed 2000 units, which is twenty per cent of the aggregate, they would receive a royalty of twenty percent of one-eighth royalty computed on the net amount realized from the sale. Assuming Earl, Jr.'s, well contributed 1000 units, he would be entitled to ten percent of the one-eighth royalty. The other lessors would receive royalties based upon the proportion of their volumetric contribution of gas to the aggregate as measured at the wellhead.

The Halls filed this multi-count contract action on behalf of themselves and others similarly situated seeking an accounting and asserting that CNX breached the lease in its allocation of the post-production costs, lost gas, and used gas.[3] The trial court sustained preliminary objections to the Halls' claim that they were entitled to royalties on the volume of gas produced and measured at their wells and that this included gas lost or used prior to the

_____

[3] The Halls also presented a breach of contract cause of action based on nonpayment of oil royalties that was dismissed pursuant to preliminary objections, and which is not at issue herein.

point of sale. Since the lease provided for calculating royalty payments based on the amount of gas sold, the court reasoned that the missing gas was obviously not part of that equation. Trial Court Opinion, 7/29/11, at 3. The Halls do not challenge that ruling herein. We agree with the trial court's reasoning and we utilize it in our disposition of the instant appeal.

The Halls subsequently amended their complaint to allege, *inter alia*, that CNX's allocation of the lost and used gas among the lessors was unauthorized under the lease.[4] Lost gas is a reduction in the volume of gas due to evaporation or leakage as it is transported through a pipeline. Used gas refers to volumes of gas that are used along the pipeline for compression, flaring, venting, and other operations associated with processing raw gas into a marketable gas and transporting it to the point of sale.

The Halls moved for summary judgment as to counts I and II of their complaint alleging breach of contract based on the allocation of lost and used gas. They contended that since the lease did not authorize the pro rata

---

[4] The Halls also alleged that the allocation of post-production costs was not permitted by the lease. They subsequently withdrew that claim, however, in light of the Pennsylvania Supreme Court's decision in **Kilmer v. Elexco Land Servs., Inc.**, 990 A.2d 1147 (Pa. 2010), which held that a lease that utilized the net-back method to allocate post-production costs for purposes of calculating royalties did not violate GMRA, the Guaranteed Minimum Royalty Act, 58 P.S. § 33.

allocation of lost and used gas among the lessors, CNX was limited to deducting only actual volumes of lost and used gas from each lessor's share of the royalty. As CNX does not measure the volume of gas from each well just prior to the point of commingling, and therefore cannot attribute to an individual well the precise amount of gas lost or used from that well, the Halls contended that CNX was obligated to pay royalties based on the volume of gas measured at each wellhead.

CNX sought summary judgment in its favor. In support thereof, it maintained that, due to the fungible nature of the compound and the physical impossibility of independently tracking each molecule from its source, it was impossible to attribute any specific amount of gas lost or used to any one of the individual wells along the pipeline. CNX renewed its argument that no royalty was due on gas that was lost or used prior to the point of sale. It also steadfastly maintained that it did not deduct an allocated amount of lost and used gas from the royalty payable on each well.

The trial court entered summary judgment in favor of CNX and adopted its opinion in *Lawrence v. Atlas Resources, Inc.*, GD-10-011904 (Alleg.Co. 2012) as the basis for its decision. The Halls appealed to this Court and they present one issue for our consideration:

> Whether a natural gas producer may allocate lost and used gas even without a provision in the lease authorizing it to do so when, under established Pennsylvania law, oil and gas leases are to be narrowly construed and the rights not directly conferred by the lease language are to be considered withheld by the lessor?

Appellant's brief at 2.

We follow a well-established standard of review in evaluating a trial court's grant or denial of summary judgment:

> We view the record in the light most favorable to the nonmoving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. Only where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to a judgment as a matter of law will summary judgment be entered. Our scope of review of a trial court's order granting or denying summary judgment is plenary, and our standard of review is clear: the trial court's order will be reversed only where it is established that the court committed an error of law or abused its discretion.

*Daley v. A.W. Chesterton, Inc.*, 37 A.3d 1175, 1179 (Pa. 2012) (citation omitted). Instantly, there is no dispute between the parties regarding the facts underlying this appeal; therefore, we confine our review to the trial court's legal conclusions.

Our Supreme Court has recognized that an oil and gas lease "is in the nature of a contract and is controlled by principles of contract law." *T.W. Phillips Gas and Oil Co. v. Jedlicka*, 42 A.3d 261, 267 (Pa. 2012). It must be construed in accordance with the terms of the agreement as manifestly expressed, and "[t]he accepted and plain meaning of the language used, rather than the silent intentions of the contracting parties, determines the construction to be given the agreement." *J.K. Willison v. Consol. Coal Co.*, 637 A.2d 979, 982 (Pa. 1994) (citations omitted). The interpretation of any contract is a question of law and this Court's scope of

review is plenary. *Id*. Moreover, "[w]e need not defer to the conclusions of the trial court and are free to draw our own inferences. In interpreting a contract, the ultimate goal is to ascertain and give effect to the intent of the parties as reasonably manifested by the language of their written agreement." *Humberston v. Chevron U.S.A., Inc.*, 75 A.3d 504, 509 (Pa.Super. 2013).

No one disputes that the Hall lease is silent as to the allocation of royalties generally among the Halls and other lessors.[5] However, that is not the issue before us. The Halls have not assailed CNX's right to *pro rata* allocate royalties generally. Rather, their challenge is limited to CNX's proportionate allocation of lost and used gas, absent a provision authorizing such allocation. The issue is one of first impression for this Court.

The Halls contend that, without language permitting a proportionate allocation of lost and used gas, CNX can deduct from their royalties only the

---

[5] Section 34.1 of The Oil and Gas Lease Act, entitled Apportionment, was approved on July 9, 2013, effective in sixty days. It provides:

> Where an operator has the right to develop multiple contiguous leases separately, the operator may develop those leases jointly by horizontal drilling unless expressly prohibited by a lease. **In determining the royalty where multiple contiguous leases are developed, in the absence of an agreement by all affected royalty owners, the production shall be allocated to each lease in such proportion as the operator reasonably determines to be attributable to each lease.**

58 P.S. § 34.1 (emphasis added).

amount of gas actually lost and/or used as measured from each well. The Halls rely upon this Court's decision in *Pomposini v. T.W. Phillips Gas & Oil Co.*, 580 A.2d 776, 778 (Pa.Super. 1990), for the proposition that "all rights claimed by the Lessee that are not conferred in direct terms or by fair implication . . . are to be construed as being withheld by the Lessor." Since the lessors did not confer the right to allocate lost and used gas "in direct terms or by fair implication," Appellant's brief at 18, the Halls argue that "[t]he fairer implication is that the parties deliberately excluded an allocation clause." Appellants' reply brief at 5.

In *Pomposini*, this Court examined whether a lease for the rights to extract oil and gas from a lessor's property permitted the lessee company to use the well as an underground reservoir to store gas. The lease, which was "for the sole and only purpose of drilling and operating for natural gas," was effective for 20 years or for as long as the lessor's well produced natural gas in paying quantities. *Id*. at 777. The lessor accepted quarterly payments from the lessee for twenty-five years, believing them to be payment for gas produced on his land. Instead, the property was being used solely for storage and not production of gas. The lessor filed suit against the lessee alleging that the use of his well for the storage of gas was fraudulent and unauthorized, and was awarded compensatory damages based on the fair rental value of the well for that period.

Both parties appealed. This Court pointedly noted that the lease to which both parties agreed did not expressly authorize the storage of gas, that it did not establish a rent to be paid for storage purposes, and that it did not "disclose an implied intent" to allow the same. *Id*. at 778. Accordingly, we concluded that the parties did not contemplate that the leased premises would be used for gas storage. Since the lease did not expressly authorize or fairly imply that the lessee was permitted to use the property to store gas, the right to such storage was not conferred to the company and was instead retained by the lessors. *Id*. at 779 ("Because the lessee did not acquire an estate in the caverns and was not authorized to store gas on plaintiff's land, . . . the lessee was liable for the unauthorized storage of gas on Pomposini's land.").

The Halls contend that, under the reasoning in ***Pomposini***, since CNX can deduct from royalties only the actual amount of gas actually lost and/or used from each well, and CNX has no means to measure that amount at the point of commingling, the lessors retain the right to all of the royalties on the lost and used gas. Accordingly, the Halls argue they are entitled to royalties based on the volume of gas as measured at each wellhead, despite the lease provision calculating the royalty on the volumes of gas sold.

CNX counters that the trial court ruled, and the Halls concede, that the lease provides for the payment of a one-eighth royalty on the amounts realized from the sale of gas. ***See*** Appellant's brief at 6. It also cites the

- 10 -

trial court's earlier ruling on preliminary objections that the Halls were not entitled to a royalty on gas that was lost or used prior to the point of sale since the Hall lease only provides for royalties on the net amount realized from the sale of gas. According to CNX, "if the gas does not reach the point of sale and there are no proceeds, there is no royalty due." Appellee's brief at 10. Consequently, lost and used gas is not allocated as part of the royalty allocation.

CNX also takes issue with the Halls' assertion that it **deducted** some value from the royalty payable for lost and used gas.[6] Rather, the one-eighth royalty was calculated when the gas was sold, and at that point, the lost and used gas was not in existence. In short, royalties were not due on lost and used gas as it did not reach the point of sale. CNX contends that the foregoing analysis is dispositive of the issue. It alleges that the Halls' argument based on *Pomposini* is misplaced and nothing more than an

---

[6] Unlike the lease herein, the royalty provision in the lease in *Lawrence v. Atlas Resources, Inc*., GD-10-011904 (Alleg.Co. 2012), provided for a deduction for the cost of transportation and compression. The lessee agreed

> (b) to pay to the Lessor, as royalty for the gas marketed and used off the premises and produced from each well drilled thereon, the sum of one-eighth (1/8) of the price paid to Lessee per thousand cubic feet of such gas so marketed and used . . . less any charges for transportation or compression paid by Lessee to deliver the gas for sale . . .

attempt to circumvent clear language in the lease that royalties are to be calculated at the point of sale.

Although CNX consistently maintains that there is no missing allocation term vis 'a vis lost and used gas, it argues in the alternative that, even assuming a term is missing, the trial court properly supplied that term. CNX contends that either the Restatement (Second) of Contracts § 204, utilized by the trial court below and in **Lawrence**, or custom and practice in the industry as employed by the district court in **Pollock v. Energy Corp. of Am.**, 2013 WL 275327 (W.D.Pa. 2013), can remedy any deficiency.

In **Lawrence**, the gas lease provided for a one-eighth royalty computed at the point of sale, minus a deduction of charges for transportation and compression. The lessee apportioned *pro rata* the royalty among the landowners based upon each well's percentage of the overall production. The landowners argued that, as a result of the allocation method used, some property owners did not receive what was promised, *i.e.*, a royalty of at least one-eighth of the sale value of his gas less the deduction for transportation and compression.[7] The court concluded that the lease unambiguously provided for royalties to be based on the volume of gas

---

[7] The landowners also argued that the *pro rata* deduction of transportation and compression costs resulted in some landowners receiving a royalty that was less than the agreed-upon royalty.

sold, not the volume of gas produced at the wellhead. **See Lawrence** Opinion, 12/12/12, at 7. ("There is no language that provides for royalties to be based on the volume of gas recorded at any location other than the point of sale."). The court found, however, that the lease was silent on the method of allocation of the one-eighth royalty among the landowners. It relied upon the Restatement (Second) of Contracts § 204 (1981), to supply "a term which is reasonable" and which comports with community standards of fairness and policy. Comment d. In doing so, the trial court explained:

> I find that the use of the *pro rata* method allows each party to receive what the party expected to receive. [The lessee] intended to expend seven-eighths of the transportation costs and receive seven-eighths of the purchase price. By using the *pro rata* method for calculating what each property owner will receive, [the lessee] will receive the share described in the lease.

Trial Court Opinion, **Lawrence**, **supra**, at 8. The method, the trial court opined, was consistent with the expectations of both sophisticated and unsophisticated sellers and community standards of fairness.

In **Pollock**, the landowners advanced an argument similar to the one proffered herein regarding the allocation of lost and used gas. Since the lease did not contain a provision for allocating lost and used gas, the lessor argued that the lessee could only deduct the value of the volumes of gas that it could establish were actually sustained at a particular well. The **Pollock** Court found that, pursuant to the terms of the lease, the landowners agreed to a royalty calculated on the net proceeds from the sale

of gas. In the absence of a clear indication from the parties regarding the allocation of those royalties, the court looked to industry custom and practice. It credited the opinion of the gas company's expert witness that, although leases have historically been silent on the issue of allocation, it has long been the custom in the industry to combine gas production from several wells and then use a reasonable method of allocation to calculate the royalties for the individual wells.

We observe preliminarily that the Halls' position is predicated on the assumption that lost and used gas is part of the royalty, a premise that CNX disputes and the trial court rejected. **See** Appellant's brief at 8 ("CNX allocates lost and used gas when calculating gas royalties."). CNX maintains that it "allocates pro rata the amounts realized from the volumes of gas **sold** back to the various wells and lessors that contribute to the sold volumes," and "pays a royalty based on those amounts." Appellee's brief at 7 (emphasis added). According to CNX, there is no volume of lost and used gas at the point of sale to allocate.

We agree with CNX. Its argument highlights a critical distinction between the lease in **Lawrence** and the Hall lease that the trial court did not appreciate. **See** Trial Court Opinion, 10/27/14, at 1 (stating "there are no material factual differences between the present case and **Lawrence**"). The argument in **Lawrence** was that there was no lease term authorizing the allocation of royalties. The Halls argue here that there is no term

- 14 -

allocating the royalties **on lost and used gas**. Admittedly, both leases state that royalties are to be based on the net amount realized at the point of sale. However, as the trial court properly concluded when it sustained preliminary objections to the Halls' claim of breach of contract for non-payment of royalties for lost and used gas, the volume of lost and used gas is not part of the royalty calculation in this case. Despite the Halls' insistence that CNX deducts the volume of lost or used gas from the one-eighth royalty computed at the point of sale, the record does not support that contention. Gas lost or used on the way to the point of sale is simply not part of the royalty computation. It necessarily follows that lost and used gas is not allocated when the royalty is allocated among the various lessors.[8]

Hence, with regard to the lost and used gas specifically, we find no ambiguity or missing allocation term in the Hall lease. The language providing for royalties to be calculated on the net amount realized at the point of sale obviates the need for a term allocating lost and used gas.[9] Accordingly, for purposes of our disposition herein, we need not engage in

---

[8] The Halls rely upon CNX's answers to two interrogatories as the basis for their contention that CNX deducts an allocated amount of lost and used gas from each lessor's royalty. *See* CNX's Answers to Interrogatories, Nos. 3 and 8. Neither answer supports that interpretation.

[9] In effect, CNX bears seven-eighths of any lost revenue attributable to lost and used gas; the lessors bear one-eighth of the lost revenue. That allocation is dictated by the provision in the lease that the one-eighth royalty is based on the net amount realized at the point of sale.

the debate whether our Supreme Court has adopted or sanctioned the Restatement (Second) of Contracts § 204, that would permit us to supply an essential missing term into the lease.  ***See Lawrence**, **supra**;* ***see Banks Engineering Co. v. Polons***, 752 A.2d 883 (Pa. 2000).  Moreover, we need not consider the wisdom of importing industry custom and practice to supply missing contract terms.  ***See Pollock***, ***supra***.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 4/7/2016