J-A06013-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| BRIAN OPIELSKI, INDIVIDUALLY AND DERIVATIVELY ON BEHALF OF TRIMLINE WINDOWS, INC. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |
| DENNIS J. TEELING AND ERIN TEELING | |
| APPEAL OF: DENNIS J. TEELING | No. 1185 EDA 2014 |

Appeal from the Judgment Entered April 9, 2014
In the Court of Common Pleas of Bucks County
Civil Division at No: 2010-01132-32-5

......................................................................................................................

| | |
|---|---|
| BRIAN OPIELSKI, INDIVIDUAL AND DERIVATIVELY ON BEHALF OF TRIMLINE WINDOWS, INC. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |
| DENNIS J. TEELING AND ERIN TEELING | |
| | No. 1186 EDA 2014 |

Appeal from the Judgment Entered April 9, 2014
In the Court of Common Pleas of Bucks County
Civil Division at No: 2010-01132-32-5

BEFORE: PANELLA, J., OTT, J., and JENKINS, J.

MEMORANDUM BY PANELLA, J.**FILED JULY 08, 2015**

Brian Opielski and Dennis Teeling cross-appeal from the judgment entered April 9, 2014.[1]  We affirm.

The relevant facts, as set forth by the trial court, are as follows.

Trimline Windows, Inc. (Trimline) is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania, and is a manufacturer of window products.  Trimline is a closely held corporation that, at all times, has operated under IRS Subchapter S.  The owners of Trimline, prior to Opielski becoming involved, were Teeling and Keith Zimmerman, who is now deceased.  Opielski was the owner of Apex Management Group, Inc. (Apex), a Pennsylvania Corporation that provided managerial and strategic consulting to companies in the window and door manufacturing industry.  Around February 2006 and continuing until February 2007, Trimline engaged the services of Apex as a consultant and Opielski became familiar with Trimline's management and business.  Around November 2006, Teeling and Zimmerman approached Opielski and requested that he join Trimline as a shareholder/officer.  The parties came to an agreement that Opielski would merge Apex into Trimline, become a 20% owner of Trimline, and become an officer and director.  Opielski's responsibility would be to run the daily

---

[1] These appeals have been consolidated.  Both parties purport to appeal from the order of the Bucks County Court of Common Pleas entered March 13, 2014, denying their post-trial motions. **See** Notices of Appeal, 4/10/14 and 4/16/14.  This is simply incorrect.  "Orders denying post-trial motions … are not appealable.  Rather, it is the subsequent judgment that is the appealable order when a trial has occurred." **Harvey v. Rouse Chamberlin Ltd.**, 901 A.2d 523, 525 n.1 (Pa. Super. 2006) (citations omitted). Here, judgment was entered by praecipe on April 9, 2014; thus, the parties' notices of appeal were mislabeled. Despite their errors, this Court will address the appeals because judgment has been entered on the verdict. **See Mount Olivet Tabernacle Church v. Edwin L. Wiegand Division**, 781 A.2d 1263, 1266 n.3 (Pa. Super. 2001). We have corrected the caption accordingly.

manufacturing operations of Trimline, manage the plant and personnel, and maintain the equipment.

On February 5, 2007, Opielski, Teeling, and Zimmerman entered into agreements for Opielski to join Trimline as a shareholder, director, and officer. Opielski merged his business, Apex [ ] with Trimline. The agreements signed were the Merger Agreement, the Shareholders' Agreement and the Compensation Agreement. Opielski was receiving 20% ownership in Trimline while Teeling and Zimmerman retained 40% each.[2] The Letter Agreement on Compensation required that Opielski, Teeling, and Zimmerman were to be paid a base salary of $63,000 per year. All of the agreements were effective as of February 15, 2007. As of that date, Teeling, Zimmerman, and Opielski were the three members of Trimline's Board of Directors.

At the time Opielski joined Trimline, Andrew Patroni, Jr., was the accountant. Starting in 2008, at Opielski's request, Trimline engaged the accounting firm of Kreischer Miller as its accountant.

Zimmerman passed away on June 7, 2008, and disputes regarding the purchase price of Zimmerman's shares and his insurance benefits arose. Disputes regarding the accounting of Trimline and the following of the Compensation Agreement also began to arise. Teeling and Opielski then began to distrust one another. The level of distrust grew to the point that they almost stopped talking to each other and communicated mostly via email or through others. Issues regarding distributions being made by Teeling and purchases by Teeling for non-business related materials on the company credit card began to arise. On December 21, 2009, Teeling called a special meeting of the shareholders to elect a third director to replace the late Mr. Zimmerman. At the meeting, Erin Teeling [Teeling's daughter] was elected to the vacant Board of Directors' seat. On December 22, 2009, Teeling and Erin Teeling called a special meeting of the Board of Directors. At this meeting, Teeling and Erin Teeling voted to terminate Opielski's employment. As

_____

[2] 100 shares were issued. Opielski received 20 shares while Zimmerman and Teeling each received 40 shares.

Opielski was terminated, the Shareholders' Agreement triggered an event requiring Teeling or Trimline to purchase Opielski's stock. Disputes as to whether Opielski was terminated for cause then arose. The Shareholders' Agreement provided for a reduction of the purchase price if Opielski's employment was terminated voluntarily or involuntarily before the year 2012. The term ["]involuntary["] essentially meant terminated for cause. On December 23, 2009, Teeling completed his purchase of Zimmerman's shares. Subsequent to Opielski's termination, Kreischer Miller declined to continue to act as Trimline's accountant[;] therefore, Trimline re-engaged the services of Mr. Patroni, its original accountant.

Opielski filed his complaint on February 3, 2010, against Teeling and [ ] Erin Teeling. The complaint was in equity and alleged a breach of contract and fiduciary duties, civil conspiracy, conversion/misappropriation of corporate funds, and a request for accounting. A jury trial was demanded.

On February 3, 2010, Opielski filed a Motion for Preliminary Injunction requesting the court remove Teeling from positions of authority within Trimline, appoint a receiver pendent lite, and require a complete financial audit of the corporation's finances. It also requested a discontinuation of payments to Teeling or the Estate of Keith Zimmerman other than outlined in the Compensation Agreement and Shareholders' Agreement and to pay Opielski the compensation outlined in those agreements, including compensation that has accrued to date but remains unpaid.

On February 17, 2010, a hearing on the Motion for Preliminary Injunction was held. The matter was conferenced for two and a half hours. The parties entered into an agreed interim order without prejudice. The only relevant item of the agreed Order at this point was the provision that Teeling pay $7,500 monthly to Opielski for up to 16 months on account.[3]

---

[3] The February 17, 2010, interim agreement (1) restricted Teeling and his wife from utilizing company credit cards, and required that they obtain reimbursement upon consent by Opielski for business expenses they may incur personally; (2) required Teeling to provide Opielski with monthly statements showing receipts and disbursements as well as year-end

*(Footnote Continued Next Page)*

On May 24, 2012, Teeling filed a Motion for Declaratory Judgment requesting that the [c]ourt [o]rder that the selection of the appraiser be made binding and conclusive on the parties due to the Shareholders' Agreement controlling the issue. On January 3, 2013, the Honorable Jeffrey L. Filey denied the motion.

On October 11, 2013, Teeling filed a Motion in Limine to Limit Issues and/or Exclude Evidence. Teeling was seeking to exclude Opielski's evidence regarding his expert's valuation of the Trimline stock as he believed the Shareholders' Agreement controlled the issue of the purchase price of the stock.[] Teeling alleged the Shareholders' Agreement stated the valuation of the stock would be decided by the appraiser selected and, therefore, Opielski was bound by that valuation. On October 18, 2013, Opielski filed an Answer to the Motion. On November 8, 2013, the Honorable Robert Mellon denied Teeling's Motion in Limine.

Beginning on December 2, 2013, a nine[-]day jury trial was held, ending on December 12, 2013. Erin Teeling was dismissed by the court and that dismissal has not been challenged by Opielski. The jury found that Teeling violated the terms of the Compensation Agreement in a way that harmed Opielski and that Teeling breached his fiduciary duty to Opielski. The jury found that damages sustained by Opielski that were proximately caused by Teeling's breach of fiduciary duty or breach of terms of the Compensation Agreement totaled to $133,952.69. A breakdown of these damages were as follows: Managerial Fees in the amount of $1,247, Pension in the amount of $14,128,

_(Footnote Continued)_ ———————————

statements and access through professionals to the company's books and records; (3) provided various payments to Opielski, including a $7,500 monthly disbursement, pending resolution of the claims and a proper accounting for how that payment is to be treated; and (4) noted that the parties would choose a mutually-agreeable auditor within thirty days to perform an audit on Trimline for the period from January 1, 2007 to March 2010. **See** Notes of Testimony ("N.T.") Hearing, 2/17/10, at 5-10. The parties chose Marcum Advisory Group. Its audit report, dated December 13, 2011, was admitted into evidence as Plaintiff's Exhibit 77 ("Marcum Audit Report"). **See** Reproduced Record ("RR") at 489a.

Audit Costs in the amount of $22,500, Zimmerman buy-out in the amount of $24,000, December 2009 Zimmerman/Teeling Distribution in the amount of $20,000, semi-monthly post termination in the amount of $12,000, Auto[mobile expenses] post[-]termination in the amount of $4,000, and a Contraloan in the amount of $36,077.69. The jury did not find punitive damages were appropriate nor that Trimline's termination of Opielski's employment with Trimline met the definition of [”]Involuntary Termination[”] as set forth in the Shareholder's Agreement.

Trial Court Opinion, dated 6/20/14, at 1-4.

Both parties filed post-trial motions. After oral argument, the trial court denied the motions. The court subsequently molded the jury's verdict of $133,952.69 to the amount of $676,106, inclusive of pre-judgment interest, as follows: (1) a credit to Teeling for the prior distribution to Opielski of $120,000; (2) $529,238 for the balance of the purchase price for Opielski's stock in Trimline, with post-judgment interest accruing at the annual rate of 0.69%; and (3) $146,868 for the balance of the damages awarded by the jury, with post-judgment interest to accrue at the legal rate of 6%.[4] Both parties appealed.

In his appeal, Opielski raises the following issues for our review.

   a. Is [Opielski] entitled to a new trial on damages because the trial court erred in refusing to submit to the jury the issue of the value of of [Opielski's] stock in Trimline Windows, Inc. as of the date he was frozen out of the corporation and in

_____

[4] The trial court proportioned the prior $120,000 disbursement made to Opielski pursuant to the February 2010 interim agreement between the stock purchase and the jury's damage award.

concluding as a matter of law that the valuation of the defendant's expert witness was binding and conclusive notwithstanding the record evidence demonstrating that [Opielski's] stock was significantly more valuable?

b. Did the trial court err in deciding as a matter of law that, notwithstanding the legal requirements for Subchapter S corporations, the corporation was legally required to make distributions for the shareholders' taxes in amounts that were disproportionate to [ ] their *pro rata* ownership interest in the corporation?

c. Is [Opielski] entitled to a new trial on the issue of damages because the trial court failed to instruct the jury on the duty of defendant Dennis Teeling to avoid self-dealing with the corporation and to avoid usurping corporate opportunities, and that he bore the burden of proof of demonstrating the fairness of every transaction in which he received personal benefit from the corporation?

d. Is [Opielski] entitled to a new trial on the issue of punitive damages because the trial court erroneously instructed the jury that the sole reason for punitive damages is to punish a wrongdoer and refusing to charge the jury that deterrence of future misconduct is a proper basis for punitive damages?

e. Whether the trial court erred in failing to mold the verdict to reflect the mathematical miscalculation of various damages that were necessarily based on upon [Opielski's] pro rata ownership of the corporation?

f. Whether the trial court erred in calculating the damages owed to plaintiff when it concluded that defendant Dennis Teeling was entitled to a reduction in the damages for a portion of the $120,000 interim payments paid to [Opielski] by the corporation during the pendency of the case?

g. Whether the trial court erred in calculating the value of [Opielski's] shares in Trimline Windows, Inc. at the time of the freeze out by failing to add 6% simple interest from the date of the squeeze out?

Appellant's Brief at 4-7.

We can quickly dispense with Teeling's cross-appeal. Teeling did not file an appellant's brief in connection with his cross-appeal. However, beginning on page 32 of his appellee's brief, he cites two cases for boilerplate law defining JNOV, before summarily addressing seven challenges pertaining to the awarded damages.[5] Teeling fails to provide any legal analysis with respect to each issue. Due to his failure to comply with the requirements of Pa.R.A.P. 2119, we are unable to provide meaningful review. We find Teeling's issues waived. **See** Pa.R.A.P. 2119; **In re Jacobs**, 936 A.2d 1156, 1167 (Pa. Super. 2007) (issue is waived for purposes of appellate review when an appellant does not develop it in a brief).

Opielski seeks a new trial on damages. Appellate courts must not interfere with the trial court's authority to grant or deny a new trial, absent a clear abuse of discretion by the trial court. **See Harmen ex rel Harmen v. Borah**, 756 A.2d 1116, 1122 (Pa. 2000).

Opielski first challenges the trial court's conclusion that the share valuation determined by Brandywine Valuations was "binding and conclusive upon Plaintiff" in accordance with the Shareholder's Agreement. Appellant's Brief at 29. He avers that while the selection of the appraiser was binding,

---

[5] Teeling did not provide a statement of questions involved to this Court, and did not annex his Pa.R.A.P. 1925(b) statement to his brief.

the valuation itself was not, and the trial court should not have removed the issue of valuation from the jury's consideration. We disagree.

Our review of questions implicating contract interpretation and applicability is as follows.

> The interpretation of any contract is a question of law and this Court's scope of review is plenary. Moreover, we need not defer to the conclusions of the trial court and are free to draw our own inferences. In interpreting a contract, the ultimate goal is to ascertain and give effect to the intent of the parties as reasonably manifested by the language of their written agreement. When construing agreements involving clear and unambiguous terms, this Court need only examine the writing itself to give effect to the parties' understanding. This Court must construe the contract only as written and may not modify the plain meaning under the guise of interpretation.

*Humberston v. Chevron, U.S.A., Inc.*, 75 A.3d 504, 509-10 (Pa. Super. 2013) (citations and internal quotation marks omitted).

"The task of interpreting a contract is generally performed by a court rather than by a jury." *Id*., at 510 (citation omitted). Where contract language has a meaning that is generally prevailing, it is interpreted in accordance with that meaning. *See Gustine Uniontown Associates, Ltd. v. Anthony Crane Rental, Inc.,* 892 A.2d 830, 837 (Pa. Super. 2006). *See generally* Restatement (Second) Contracts, §§ 202(3)(a), 203(a). "It is axiomatic that contractual clauses must be construed, whenever possible, in a manner that effectuates *all of the clauses being considered*." *Welteroth v. Harvey*, 912 A.2d 863, 866 (Pa. Super. 2006) (citation omitted; emphasis added).

The Shareholders' Agreement at ¶ III(A)(3) specifically provided that if a shareholder's employment with the corporation were terminated, with or without cause, the terminated shareholder would be deemed to have made an offer to sell all of his Stock. Pursuant to ¶ III(B) and (C)(3), if the remaining shareholders did not choose to buy the shares of the terminated shareholder, the Corporation was required to purchase the stock.

At the time of the signing of the Shareholders' Agreement in 2007, the parties agreed that the purchase price for each share of stock would be $60,000. **See** Shareholders' Agreement at ¶ IV(A) and Schedule D. The Agreement also provided that within 60 days following the end of each fiscal year, the Corporation and the Shareholders "shall agree (i) to continue the existing Agreement Price or (ii) upon a new Agreement Price[.]" **Id**., at ¶ IV(B).

In the event of an employment termination, if the corporation and the shareholders could not agree on a purchase price for each share, the shareholders agreed that the purchase price "*shall be determined by an independent business appraiser* selected by the [terminated] Shareholder and the Corporation." **Id**., at ¶ IV(C) (emphasis added). "In the event the parties cannot agree on the selection of the appraiser, then the appraiser shall be selected by the Corporation's then regularly engaged accountant, in good faith, whose selection shall be binding and conclusive upon the parties hereto." **Id**.

Finally, the Agreement specifically provides that the Shareholder's Agreement "shall … be legally binding upon the parties[.]" *Id*., at ¶ XV (B).[6]

Trimline and its shareholders never changed the original share price set in the 2007 Shareholders' Agreement. After Opielski's employment termination, the parties could not agree to continue that share price, nor upon a new share Price. Although the parties initially agreed that the accounting firm of Kreischer Miller should choose the independent appraiser, Kreischer declined the invitation.[7] Each party then submitted a list of recommended appraisers to Mr. Patroni, the "then regularly engaged accountant." *Id*. at ¶ IV(C). Patroni chose Brandywine Valuation, an appraiser originally proposed by Opielski, to conduct the appraisal. Opielski also hired an appraiser to obtain another valuation of Trimline.[8]

Reading the relevant clauses of the Shareholders' Agreement together, we conclude that Opielski was bound by his agreeing not only to the method

_____

[6] The Agreement also provides two specific schedules of percentages of purchase price to be paid for Opielski's shares in the event his employment was voluntarily or involuntarily terminated, dependent on the year of termination. *See* Shareholders' Agreement, ¶ III(C)(3).

[7] On December 22, 2009, the date of Opielski's employment termination, the Corporation's accountant was Kreischer Miller. After Opielski's discharge, however, Kreischer refused to continue to serve as Trimline's accountant, and Trimline returned to using Mr. Patroni as its accountant.

[8] Brandywine Valuations valued the business at $3.06 million. Opielski's appraiser valued the business at $5.4 million as of December 22, 2009, the date of his termination from employment.

of choosing the independent appraiser, but also that the independent appraiser would determine the share price in the event of a disagreement such as that presented here. Accordingly, we agree with the trial court that the issue of share pricing was a matter of contract interpretation, which, as a matter of law, was properly removed from the jury's determination.

Opielski also argues that Patroni's choice of appraiser was not done in good faith. As the trial court noted, Opielski did not proffer any evidence of bad faith to support his contention. Considering the undisputed evidence showed that Patroni chose the appraiser because Opielski had recommended him, we conclude that Opielski's argument is specious at best.

Opielski also avers that "the jury determined that Teeling breached his fiduciary duty to Opielski by wrongfully freezing him out of Trimline" and, accordingly, the jury should have been allowed to make an award of the fair market value of the shares based on the trial testimony of the parties' appraisers. Appellant's Brief, at 30-32, relying on *Viener v. Jacobs*, 834 A.2d 546, 556 (Pa. Super. 2003).

In *Viener*, the appellant challenged the trial court's calculation of compensatory damages after the court explicitly concluded he had been "froze[n] out" from a meaningful role in close corporation's operation by the other two shareholders. 834 A.2d at 556. The trial court calculated compensatory damages based on a "fair value of Viener's interests in" the enterprise rather than the share price provided in the shareholder

agreement. ***Id***., at 558. The trial court did not assign the share valuation provided in the shareholders' agreement because that agreement "was silent regarding situations in which a shareholders' employment was terminated involuntarily. Therefore, the agreement did not apply." ***Id***.

Unlike ***Viener***, the Shareholders' Agreement at issue here was *not* silent on the issue of share valuation in the event of employment termination. The Agreement clearly provided that in the event of a termination from employment, voluntary or involuntary, the price for each share of Stock would be determined by an independent business appraiser. Based on our reading of the Shareholders' Agreement, we conclude that the trial court correctly determined that the value of the shares could be determined only by the method set forth in the binding Shareholder's Agreement.

Opielski also avers that by concluding that Brandywine Valuation's appraisal of the company stock was binding upon Opielski, the trial court violated the coordinate jurisdiction rule because two other judges had denied Teeling's pre-trial motions to preclude Opielski's expert from testifying at trial on the value of the business.[9]

The trial court addressed this issue as follows.

---

[9] Our review of the relevant pre-trial motions indicates that Teeling was trying to preclude Opielski's expert from testifying as to his valuation of the company because Brandywine Valuation had been chosen in accordance with the Shareholders' Agreement.

Opielski claims the coordinate jurisdiction rule precluded us from reversing the prior Orders of Judge Finley and Judge Mellon on this issue. On January 3, 2013, the Honorable Jeffrey L. Finley denied Teeling's Motion for Declaratory Judgment which requested that the Court order that the selection of the appraiser be made binding and conclusive on the parties due to the Shareholders' Agreement controlling the issue. On November 8, 2013, the Honorable Robert Mellon denied Teeling's Motion in Limine to Limit Issues and/or Exclude Evidence which sought to exclude Opielski's evidence regarding his expert's valuation of the Trimline stock as Teeling believed the Shareholders' Agreement controlled the issue of the purchase price of the stock, therefore the valuation of the stock decided by the appraiser selected was binding on the parties. We do not believe the coordinate jurisdiction rule applies here.

It has been held that "when determining whether the coordinate jurisdiction rule applies, the court is not guided by whether an opinion was issued in support of the initial ruling. Instead, this Court looks to where the rulings occurred in the context of the procedural posture of the case. *Riccio v. Am. Republic Ins. Co.*, 705 A.2d 422, 425 (Pa. 1997) (citations and quotations omitted). In this case, we did not believe the issue of the valuation of the stock could be decided prior to trial because evidence needed to be presented. However, in the event that the Court believes the coordinate jurisdiction rule does apply, we believe this case represents a circumstance where a departure from the rule is allowed.

The Supreme Court has stated "judges of coordinate jurisdiction sitting in the same case should not overrule each others' decisions. Departure … is allowed only in exceptional circumstances such as where there has been an intervening change in the controlling law, a substantial change in the facts or evidence giving rise to the dispute in the matter, or where the prior holding was clearly erroneous and would create a manifest injustice if followed." *Ryan v. Berman*, 813 A.2d 792, 795 (Pa. 2002) (quoting *Commonwealth v. Starr*, 664 A.2d 1326 (Pa. 1995)). In our case, the intervening issue concerning the valuation of the stocks that still needed to be decided concerned selection of the appraiser. At the time Judge Finley and Judge Mellon addressed the issue, *there was no evidence before them* as to the selection of appraiser and that issue was in dispute. Because of that, a decision to grant either of the Motions they

decided would have been premature. At the trial, undisputed evidence was presented that the Shareholders' Agreement controlled this issue, which would make it inappropriate to allow the jury to consider it. Therefore, we were not bound by the previous orders and made our own ruling that Opielski was bound by the valuation made by the appraiser since the undisputed evidence showed the appraiser was properly selected in accordance with the Shareholders' Agreement. As indicated, this evidence was not available to Judge Finley or Judge Mellon.

Trial Court Opinion at 18-19 (emphasis added).

The previous denials of Teeling's pre-trial motions to preclude or limit were not findings of fact on the ultimate legal issue of the proper share valuation. It was only after presentation of all of the evidence that the issue could be finally resolved. Accordingly, we do not agree that the trial court violated the coordinate jurisdiction rule.

In his second issue, Opielski avers that the "trial court erred in ruling that the terms of the Shareholders' Agreement precluded Opielski from seeking damages for certain under-distributions." Appellant's Brief at 52. He states that Teeling and Zimmerman each received distributions in April and June 2007 in the amounts of $55,000 and $63,068, respectively, and pursuant to the Shareholders' Agreement, he should have received distributions as well.

The Shareholders' Agreement provides, in relevant part, as follows.

So long as the Corporation's Subchapter S election is in effect, the Board Directors of the Corporation shall, unless prohibited by law or agreement from doing so, declare dividends from time to time (but at least annually) in order to enable the Shareholders to pay United States federal, state and local income taxes on their shares of the Corporation's items of income, gain, loss,

- 15 -

deduction and credit. Such dividends, if permitted, will be declared in an aggregate amount sufficient to enable the Shareholders to pay such taxes as if the Shareholders were subject to tax at the highest marginal aggregate income tax rate then applicable to any Shareholder and such amount shall be distributed among the Shareholders in proportion to their Stock holdings, such distribution to be made annually at least ten (10) days prior to the deadline for filing tax returns. The Board of Directors of the Corporation may, in its sole discretion, authorize greater dividends and distributions

Shareholders' Agreement at ¶ II(C)(1).

According to the Marcum Audit Report, Trimline paid 2006 taxes on behalf of Teeling and Zimmerman on January 15, 2007, and April 13, 2007, in the amounts of $55,000 and $63,068, respectively (not April and June, as Opielski avers). **See** Marcum Audit Report at 32, RR 527a. The Marcum Report refers to these tax payments as "distributions." **Id**. The trial court addressed Opielski's challenge as follows.

The parties signed a Shareholders' Agreement, which became a binding contract on all parties. The Shareholders' Agreement essentially states in Section II, C-1 that so long as the Corporation's Subchapter S election is in effect, the Corporation will make distributions for payment of the company's taxes. In accordance with the Shareholders' Agreement, the payment of taxes for shareholders is permitted without regard to when it was paid and is based on when tax liability were incurred. The payments in question were received by Teeling and Zimmerman in early 2007 to pay the taxes due on Trimline's income from 2006. Opielski was not a shareholder in 2006 so he did not have any liability for taxes on the corporation's 2006 earning. Therefore, Opielski would not be entitled to any amount that Teeling and Zimmerman received because they had an obligation for taxes in the corporation's 2006 earnings.

Trial Court Opinion at 17.

Opielski does not challenge the enforceability of the clause of the Shareholders' Agreement allowing for tax payments to be made from the Corporation for shareholders. He does not dispute that he was not a part of Trimline in 2006. There is no provision in the Agreement providing that Opielski would receive a payout, proportionate or otherwise, based on the distributions made for the payment of 2006 taxes. We discern no error on the part of the trial court in concluding that the Shareholders' Agreement controlled the resolution of this issue.[10]

Opielski's third and fourth issues challenge jury instructions. A jury charge is adequate "unless the issues are not made clear, the jury was misled by the instructions, or there was an omission from the charge amounting to a fundamental error." *Tincher v. Omega Flex, Inc.*, 104 A.3d 328, 351 (Pa. 2014) (citations omitted). On review, "the proper test is not whether certain portions or isolated excerpts taken out of context appear erroneous. We look to the charge in its entirety, against the background of the evidence in the particular case, to determine whether or not error was committed and whether that error was prejudicial to the complaining party."

_____

[10] Opielski hints that because the 2006 tax payment was titled a "distribution" in the Marcum Audit Report, and he was not given a *pro rata* share, the corporation somehow had two different classes of stock in violation of Subchapter S rules and regulations. *See* Appellant's Brief at 54, citing federal regulations and federal case law. He fails to develop this argument with reference to the facts of this case or any Pennsylvania authority. This argument is, thus, waived. *See* Pa.R.A.P. 2119; *Jacobs*, *supra*.

*Krepps v. Snyder*, 112 A.3d 1246, 1256 (Pa. Super. 2015) (citation omitted).

Opielski avers that the trial court's jury instruction on punitive damages was inadequate because it did not mention the deterrent effect such an award would have. The trial court instructed the jury regarding punitive damages, as follows.

> Punitive damages are designed to punish somebody if punishment is appropriate. So punitive damages do not have a specific correlation to a specific item of compensatory damages. They are really just a penalty. And if you decide that that penalty is appropriate, then you have to put in an amount. And there is no testimony about what that amount is. That is up to you as jurors to collectively decide, if punitive damages are appropriate, what the appropriate amount is.

Notes of Testimony, Trial, 12/11/13, at 32-33.

Addressing Opielski's challenge to this instruction, the trial court stated:

> It is well known that punishments and penalties are meant to deter behavior, therefore, we do not believe that by failing to specifically instruct the jury on deterrence, the charge confused the jury, misled the jury, or may have affected the jury's verdict. We believe our charge adequately and clearly covered the subject[.]

Trial Court Opinion at 15-16. We agree.

After review of the totality of the evidence of the case, we cannot conclude that the trial court's instruction was confusing, misleading, or prejudicial to either party. *See Tincher*, *supra*. Accordingly, this issue is without merit.

Opielski also challenges the jury instruction given regarding Teeling's fiduciary responsibilities to Trimline. In support, Opielski quotes the instruction he requested, followed by a string cite of case law—with no explanation whatsoever of its relevance. He fails to provide us with the instruction that *was* given by the trial court with respect to fiduciary duty. Then, without citation to the record or legal authority, Opielski provides a self-serving, selective reiteration of evidence and concludes that a "substantial award in Opielski's favor would have been forthcoming" if the court had, in essence, given the instruction he requested. Appellant's Brief at 52. Opielski has failed to provide any legal analysis or otherwise develop this issue as required by Pa.R.A.P. 2119. It is, thus, waived. ***See Boatin v. Miller***, 955 A.2d 424, 431 (Pa. Super. 2008) (indicating that the failure to develop an argument with citation to and analysis of relevant authority waives the issue on appeal).

Opielski next challenges the trial court's order molding of the verdict. That order provides the following.

> **AND NOW**, this 12th of March, 2014, the verdict of the jury is molded and judgment is entered in favor of Plaintiff Brian Opielski and against Defendant Dennis Teeling in the principal sum of $676,106.00 inclusive of prejudgment interest.
>
> This amount is allocated as follows:
>
> $529,238.00    is the balance of the purchase price for Plaintiff's interest in Trimline Windows Inc. This amount shall accrue post-Judgment annual interest at the rate of .69% simple.

- 19 -

> $146,868.00      is the balance of the damages award by the jury, and shall accrue post-judgment Interest at the rate of 6% simple.

This judgment includes credits for prior payment of $120,000 allocated per this Court's Order of March 6, 2014.

This judgment terminates the Interim Order of February 17, 2010.

Order, entered 3/13/14.

Opielski avers that "the trial court erred in awarding 0.69% simple prejudgment interest on the stock purchase damages resulting from Teeling freezing Opielski out of the corporation." Appellant's Brief at 58. Without citation to Pennsylvania authority, he concludes that "[d]amages for the value of Opielski's stock accrued as of the date of his termination, December 22, 2009," and "[u]nder applicable law, he was entitled to 6% simple interest on the outstanding balance." *Id*. That is the sum and substance of his argument on this discrete issue.

In addressing Opielski's challenge, the trial court stated:

Again, the Shareholders' Agreement is controlling in regards to this issue. The Shareholders' Agreement states in Section V-F that the interest on unpaid balances of the Purchase Price shall accrue from the date of the Triggering Event at the minimum annual rate [then] necessary to avoid the application of the imputed interest provisions of the IRS Code. The parties agreed that the applicable minimum annual interest rate that would be imputed according to the IRS in 2009 for a short term, thirty[-]four month loan, was 0.69%. Therefore, this interest rate is the rate we applied to the valuation of Opielski's stock. We applied this to both pre-judgment and post-judgment interest since that is what the Shareholders' Agreement required. The Shareholders' Agreement specifies in Section V-G that payments

- 20 -

for the buy-out of a shareholders[′] stock after a triggering event is over time and is to be secured by a Promissory Note in the form attached to the Shareholders' Agreement. That Promissory Note specifically provides that the interest rate established by the applicable IRS provision, in this case 0.69%, was applicable in the event of a default both pre[-] and post-judgment. We found that the parties were bound by that term of the Shareholders' Agreement.

Trial Court Opinion at 22.

Opielski provides absolutely no acknowledgement of the provisions of the Shareholders' Agreement found by the trial court to be controlling. Nor does he mention that the parties had discussed and reached an agreement on the issue of prejudgment interest. We conclude that the trial court did not err in awarding interest in accordance with the parties' agreements. **See TruServ Corp. v. Morgan's Tool & Supply Co., Inc**., 39 A.3d 253, 261 (Pa. 2012) (stating that where a contract expressly provides for the payment of interest, it is payable not as damages but pursuant to a contract duty that is enforceable).

Next, Opielski avers that the trial court "erred in concluding that Teeling was entitled to a reduction in the damages owed to Opielski for a portion of the $120,000 interim payments received by Opielski in accordance with the Interim Agreement." Appellant's Brief at 59. He argues that because Trimline, not Teeling, made the interim payments, "the trial court should have considered all of the interim payments to have reduced the amount owed to Opielski for his stock" and, if it had done so, "the damages awarded to Opielski would have been greater." **Id**., at 59-60.

Opielski cites no case law and utterly fails to provide any analysis to support his speculative conclusion. Accordingly, this argument is waived. *See* Pa.R.A.P. 2119; ***Banfield v. Cortes***, 110 A.3d 155, 168 n.11 (Pa. 2015) (observing that "[w]here an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, the claim is waived. It is not the obligation of an appellate court to formulate an appellant's arguments for him.").

Finally, Opielski avers that the trial court erred in not molding the verdict to compensate for the jury's alleged "mathematical miscalculation" when it awarded him 20% of the managerial fees, pension payments to Zimmerman's widow, the Zimmerman Buy-out, and the December 2009 distributions. Appellant's Brief at 60.[11] Teeling responds that there were many items of damages claimed by Opielski, for many of which the jury did not award any damages. He also observes, "there is no basis in law for the trial court to invade the province of the jury and conclude that Opielski is entitled to one-half of the amount that was in dispute, rather than 20% of the amount that was in dispute." Appellee's Brief at 32.

---

[11] Opielski argues that, because he owned 50% of the amount of stock owned by Teeling until December 23, 2009, and 25% of the amount of stock owned by Teeling after Teeling acquired the shares from Zimmerman's estate, "[t]o properly compensate Opielski [], the jury would have had to award Opieski 50%, and later 25%, of the amount of the over-distribution to Teeling." Appellant's Brief at 60.

The trial court addressed both parties' challenges to the jury's damage award as follows.

> [T]he jury's award is a clear example of a jury compromise.
>
> The Superior Court has held that compromise verdicts, which may arise out of the issue of damages or negligence, are expected and allowed. ***Hose v. Hake***, 192 A.2d 339, 341 (Pa. 1963). [ ] It is also the province of the jury to resolve inconsistencies and contradictions, to disbelieve all or part of the testimony of the witnesses, and to thereafter compromise the verdict or establish an amount which it determined would justly compensate the plaintiff for his loss. ***Fierman v. [SEPTA]***, 419 A.2d 757, 759 (Pa.Super. 1980). The fact that a verdict was a compromise is not a basis for a new trial unless the verdict was so unreasonably low as to present a clear case of injustice. ***Campana v. Alpha Broad Co., Inc.***, 361 A.2d 708, 710 (Pa. Super. 1976). The Superior Court has also held that "the injustice of the verdict should stand forth like a beacon. If the verdict bears a reasonable resemblance to the proven damages, it is not the function of the court to substitute its judgment for the jury's." ***Rutter v . Morris***, 243 A.2d 140, 142 (Pa. Super. 1968) (quoting ***Elza v. Chovan***, 152 A.2d 238, 241 (Pa. 1959)).
>
> In the case at hand, we believe the jury's award for damages was a proper compromise verdict. … We believe that the jury simply weighed the credibility of witnesses and evidence and compromised on the issue of damages. The damages do not seem to be an injustice to either party, as the jury could have awarded more or less on each issue. Also, the total award Plaintiff received from the jury for damages was $146,868.00, which is not an unreasonably low amount.

Trial Court Opinion at 14.

Opielski is, in essence, seeking to alter the jury's verdict. He does not provide any case law to support his argument that the jury's award can and should be changed. Based on our extensive review of the trial transcripts and exhibits, we conclude that the trial court properly exercised its discretion

and made no errors of law in molding the verdict as it did, and in denying Opielski's motion for a new trial.

Judgment affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 7/8/2015