J-A12039-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| CARLTON J. ST. BERNARD, JR. AND TERRY ST. BERNARD | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| DONALD A. MARTIN, JR. | : | |
| | : | No. 329 EDA 2023 |
| Appellant | : | |

Appeal from the Judgment Entered January 26, 2023
In the Court of Common Pleas of Bucks County Civil Division at No(s):
201605807

BEFORE:  PANELLA, P.J.E., KING, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:                **FILED JULY 10, 2024**

Appellant Donald A. Martin, Jr., appeals from the judgment entered in the Court of Common Pleas of Bucks County in favor of Appellees Carlton J. St. Bernard, Jr., and Terry St. Bernard (collectively "Appellees") in this landlord-tenant action.  After a careful review, we affirm.

The relevant facts and procedural history are as follows: On October 7, 2016, Appellees, who are husband and wife, filed a civil complaint against Appellant alleging breach of contract (failure to pay rent) and breach of contract (damages to property).  Appellees requested the trial court enter judgment restoring Appellees to possession, as well as award monetary

_____

[*] Former Justice specially assigned to the Superior Court.

damages. Further, Appellees filed a count seeking attorneys' fees and/or costs pursuant to the parties' agreements.

Appellees averred that they owned a house on Harmony Court West in Doylestown, Pennsylvania. On August 26, 2015, Appellees and Appellant executed a residential lease agreement, an agreement of sale setting forth the terms if Appellant opted to purchase the property, and an addendum to the agreement of sale. The lease, agreement of sale, and addendum were related to each other, and Appellees attached the documents as exhibits to their complaint.

Appellees averred the term of the lease was for eighteen months (from August 27, 2015, to February 28, 2017), and the lease provided that Appellant would pay $4,500.00 in rent per month on the first day of the month. The lease provided a provision that late payments would result in a $100.00 late fee. The agreement of sale provided that, if Appellant opted to purchase, settlement for the sale of the property would occur on February 28, 2017, or sooner if the parties agreed to an earlier date. The agreement of sale further provided that $1,000.00 of the monthly rent under the lease would be applied toward the purchase price of the property.

Moreover, pursuant to the agreement of sale, Appellant provided a security deposit of $5,000.00, as well as the last month's rent and two additional months' rent prior to taking possession of the property. Paragraph

four of the addendum[1] indicated that if settlement on the property did not occur before February 28, 2017, all of the money Appellant paid towards the purchase price of the property during the eighteen-month lease would be deemed non-refundable.

Appellees averred that Appellant neither timely paid the rent nor paid the late fee in March or May of 2016. They further averred that on July 30, 2016, Appellant informed Appellees that he no longer wished to purchase the property, and he wanted to terminate the lease as of October 1, 2016. Appellees averred Appellant failed to make rent payments or late fees for August, September, and October of 2016.

Additionally, Appellees averred that, during the time Appellant lived in the house, Appellant permitted his dogs to urinate on the carpets, thus requiring the replacement of the carpets. They further alleged Appellant allowed the home to become infested with fleas and ants. Appellees averred that, in violation of the lease, Appellant kept lizards and snakes in the house, and Appellees had to hire an exterminator to remove the snakes. Moreover, Appellees alleged Appellant allowed water to pool in the laundry room, thus

---

[1] Paragraph 4 of the addendum specifically provides:
Residential lease and agreement of sale are connected. Buyer will confirm with Sellers by February 1, 2017, that they are purchasing the house. In the event settlement does not take place before February 28, 2017, all the money paid toward the purchase of the property over the 18-month lease ($23,000) shall be deemed non-refundable.
Addendum, executed 8/26/15, ¶ 4.

resulting in damage to the floor and shoe molding, as well as water to flow into the finished basement, thus damaging the walls, shoe molding, and carpets.

On November 14, 2016, Appellant filed an answer with new matter and a counterclaim. Therein, Appellant raised a claim of breach of contract against Appellees. Specifically, he alleged the agreement of sale, addendum, and lease were intertwined. He indicated the agreement of sale contained two contingencies, an appraisal and inspection contingency, which gave Appellant the right to terminate the agreement of sale, as well as the lease, for a full refund of his deposit money.

Appellant averred the house had a pre-existing issue with the exterior stucco, and the parties agreed the home would undergo extensive stucco remediation at Appellees' expense. Appellant alleged that for three months large portions of the house could not be used or occupied because of the stucco remediation. Further, Appellant averred Appellees refused to pay for all of the stucco repairs, and the stucco repairs were not otherwise done to Appellant's reasonable expectations.

Appellant further alleged that, due to the lengthy and inadequate stucco repairs, the master bathroom sustained water damage, and the house became infested with ants and a snake. Also, Appellant alleged that he discovered mold in the finished basement. Appellant alleged he continued to make monthly rent payments; however, due to Appellees not repairing the home to

Appellant's satisfaction, Appellant no longer wished to purchase the property. He alleged that, on July 30, 2016, he notified Appellees that, under the inspection contingency, he was terminating the lease and agreement of sale. He alleged that, at this point, the lease became a month-to-month lease. He averred he suffered financial damages, including being forced to vacate the property due to the mold, and he sought monetary damages.

The matter proceeded to arbitration, and on May 19, 2021, the arbitrator found in favor of Appellees and against Appellant on all claims. The arbitrator awarded Appellees $33,776.30. Appellant filed a timely appeal from the arbitrator's award, and the matter proceeded to a bench trial on March 10 and 11, 2022.

At the bench trial, Terry St. Bernard ("Ms. St. Bernard") testified she and her husband lived at the property at issue; however, they moved to California and put the house on the market for sale or rent in 2015. N.T., 3/10/22, at 27. In April of 2015, Appellees hired a stucco inspector, who issued a report on July 13, 2015. *Id.* at 44-45.

Ms. St. Bernard indicated that, during the summer of 2015, Appellant expressed an interest in leasing the property with an option to purchase. *Id.* at 35-36. Ms. St. Bernard testified Appellant was represented by a real estate agent, and Appellant later told her that he was also represented by a real estate lawyer. *Id.* at 36. The parties entered into a lease agreement with rent due on the first of each month. *Id.* at 45. The lease provided that, if the

rent was not paid within five days, there was a late fee of $100.00. *Id.* The rent was $4,500.00 per month over an 18-month term. *Id.* at 50. Ms. St. Bernard testified that Appellant gave Appellees a $5,000.00 security deposit for the lease, and the money was also considered earnest money if Appellant decided to purchase the property. *Id.* at 45. Moreover, Appellant agreed to pay "a few months [rent] upfront[.]" *Id.* at 49.

Ms. St. Bernard confirmed the parties entered into an agreement of sale and addendum for the property. The addendum provided that, if Appellant ultimately purchased the property, $1,000.00 of each $4,500.00 monthly rent payment would be applied to the purchase price. *Id.* at 50. The agreement of sale provided that, if Appellant did not purchase the property by February 28, 2017, all monies set aside towards purchase of the property would be retained by Appellees. *Id.*

Ms. St. Bernard testified that, prior to listing the property for sale or lease, Appellees discovered an issue with the stucco on the exterior of the house. *Id.* at 54. Ms. St. Bernard confirmed Appellant was made aware of the stucco repair issue before he signed the sales agreement, lease, and addendum. *Id.* at 59. Specifically, Lunny Environmental Services ("Lunny") inspected the stucco, Lunny issued a report on July 13, 2015, and Appellant initialed the report indicating his receipt thereof on August 14, 2015. *Id.* at 55. Appellees hired Ken Kehs Construction ("Mr. Kehs") to perform agreed upon stucco remediation. *Id.*

Ms. St. Bernard testified that, when she completed a seller's disclosure statement, she affirmatively indicated that the exterior of the house had stucco. *Id.* at 63. She indicated "no" to the question of whether she was aware of any past or present moving, shifting, or deteriorating walls and foundation. *Id.* Ms. St. Bernard indicated that she attached Lunny's report to the seller's disclosure statement. *Id.* at 68. She noted that she initially indicated "no" to the question of whether there were any material defects to the property, dwelling, or fixtures, which were not disclosed elsewhere on the form. *Id.* However, after she received Lunny's report about the stucco, she marked "yes" to the question and put her initials next to the box indicating "yes". *Id.* at 69-70.

Ms. St. Bernard acknowledged that, under the agreement of sale, Appellees agreed to perform the stucco repairs that were listed in Lunny's stucco evaluation report. *Id.* at 70. She noted that, minus her deductible, her insurance carrier covered the cost of the repairs. *Id.* at 71. She testified that, under the agreement of sale, the stucco repairs were to be completed by the end of October of 2015, and the repairs to the stucco were completed by this deadline. *Id.* at 72. Ms. St. Bernard indicated she instructed Mr. Kehs to do everything required to remediate the stucco. *Id.* at 73. She noted her insurance carrier periodically sent an inspector to examine the stucco repair work. *Id.* She also noted that she received a five-year warranty from

Mr. Kehs with regard to the stucco repairs, and after the repairs were finished, Appellant "stated in an e-mail they did a good job." *Id.* at 81.

Ms. St. Bernard testified that, after Mr. Kehs opened the walls to fix the stucco, he discovered that water was leaking into the house behind the chimney. *Id.* at 74. Ms. St. Bernard telephoned her insurance carrier, and the insurance inspector confirmed repairs were needed to the chimney area. *Id.* at 75. Accordingly, Ms. St. Bernard instructed Mr. Kehs to remediate the issue, and after he did so, the insurance inspector confirmed it was suitable. *Id.*

She noted that part of the repairs to the chimney required Mr. Kehs to have access to the interior of the home, and large decorative stone pieces from the mantel to the ceiling had to be removed. *Id.* at 76. After the chimney was repaired, Appellees and Appellant agreed that each would pay half the cost of re-attaching the stone pieces to the fireplace ($1,800.00 each). *Id.* at 79. In the event Appellant purchased the house, Appellees would reimburse Appellant for the half ($1,800.00), which Appellant paid. *Id.*

Ms. St. Bernard confirmed Appellant moved into the house in late August of 2015, so he was living in the home while the repairs were being made. *Id.* at 76. She noted Appellant "understood that at the time [they] entered their agreements" repairs would be made while he was living in the house. *Id.*

Regarding the payment of rent, Ms. St. Bernard testified Appellant did not pay his rent on time each month. *Id.* at 82. She noted rent payments

were late in March and May of 2016. *Id.* at 83. Further, he made no rent payments from August of 2016 through February of 2017. *Id.* She also indicated that Appellant was responsible for the utility bills, and on two different occasions, he failed to pay the bills. *Id.* at 84.

Ms. St. Bernard confirmed she received an email from Appellant on July 30, 2016, wherein Appellant indicated he wanted to terminate the agreement of sale and lease. *Id.* at 85. Appellant informed her that he was dissatisfied with the condition of the house, he no longer wished to purchase it, and he would not be paying any further rent, although he planned to reside in the house until he could find a suitable replacement. *Id.* at 85-86.

Ms. St. Bernard indicated that, prior to the July 30, 2016, email, Appellant had never complained to her about the house. *Id.* at 86. She testified that, prior to the July 30, 2016, email, Appellant never told her that the house was not habitable or that additional modifications were needed. *Id.* at 142. He gave her no opportunity to make any further changes to accommodate him. *Id.* She noted that, after Appellant failed to pay rent in August of 2016, she hired an attorney, who filed eviction proceedings against Appellant. *Id.* at 88, 145. Appellant moved out of the property on September 17 or 18, 2016, and Appellees re-listed the property for sale and rent. *Id.*

In October of 2016, after inspecting the property, Appellees sent Appellant a letter indicating they were not going to return either the $2,500.00 pet deposit related to the lease or the $5,000.00 security deposit. *Id.* at 94.

Ms. St. Bernard testified Appellant's dogs had torn up the backyard, urinated on the carpets, and infested the house with fleas. *Id.* at 100-01, 130. She noted Appellant, as the tenant, was responsible for exterminating pests; however, he did not do so, thus resulting in Appellees bearing the cost after he left the property. *Id.* at 130-32. She further noted that, regarding the $5,000.00 security deposit, Appellees did not return it because there was water damage to the finished basement and laundry room. *Id.* at 102-08, 120-22.

Additionally, Ms. St. Bernard testified that, pursuant to the lease, Appellant was obligated to pay for mowing and other lawn care; however, despite Appellees forwarding the bills to Appellant, he did not pay the bills for May, June, or July of 2016. *Id.* at 137-39. Thereafter, Appellees sold the property to another buyer in August of 2017. *Id.* at 90.

On cross-examination, Ms. St. Bernard confirmed that, on the seller's disclosure form, she initially answered "no" to the question of whether there were any other defects; however, she changed the answer to "yes" after she received Lunny's report about the stucco issues. *Id.* at 161. She then hired Mr. Kehs on July 23, 2015, to repair the stucco. *Id.* at 174. She authorized Mr. Kehs to make all repairs in accordance with Lunny's report, and when he was finished, the inspector from her insurance carrier confirmed "everything was up to code." *Id.* at 185. She specifically indicated that all stucco that

"was required to be remediated" was done so by Mr. Kehs by the end of September or October of 2015. *Id.* at 205.

Ms. St. Bernard indicated that the agreement of sale provided that, if Appellant purchased the property, he would be given a $5,000.00 credit because of the condition of the upstairs carpet. *Id.* at 180. She reiterated that Appellant never complained about the stucco repairs until he sent her an email on July 30, 2016, and prior thereto, Appellant indicated Mr. Kehs "did a good job." *Id.* at 197. She indicated that Appellant suggested Appellees put Hardie Plank, rather than stucco, on the outside of the house. *Id.* at 200. However, Appellees declined to do so because they did not like the aesthetic. *Id.* Appellees informed Appellant that, if he bought the house, he could put Hardie Plank on it. *Id.* at 204.

Additionally, as it relates to moisture in the house, Ms. St. Bernard testified that from October of 2015 until Appellant sent the email on July 30, 2016, Appellant never complained about moisture or anything else being "wrong with the house." *Id.* at 212. She noted the first time Appellant complained was in the July 30, 2016, email, at which time Appellant was already planning to exit the house. *Id.* at 211-12.

On redirect examination, Ms. St. Bernard testified that, when she inspected the house after Appellant vacated the premises, she discovered the entire finished basement had been flooded with water. *Id.* at 220.

Renee Kunkle, who was Appellant's realtor, testified she conducted a walk-through of the house with Appellant after he signed the agreement of sale and lease but before he occupied the premises in 2015. *Id.* at 230, 247. She pointed out to him that the finished basement had a "musty smell," there was a dehumidifier in the basement, and a piece of molding was missing. *Id.* at 231. She indicated that Appellant was unconcerned. *Id.* She noted the time during which the stucco and fireplace were being fixed was difficult for Appellant and his family because they were unable to use "a big section of the house." *Id.* at 233.

Ms. Kunkle testified she was present with Appellant and conducted a walk-through when he exited the premises in 2016. *Id.* at 234. She noticed the finished basement had a "musty" smell; however, she did not observe any water or wet areas. *Id.* at 235-38. She noted that she could hear the sump pump running, and it appeared to be working. *Id.* at 238.

Appellant indicated that, during his lifetime, he has been a contractor. N.T., 3/11/22, at 16-17. He testified the lease provided a clause indicating that, if he ended the lease early, he needed to "continue to pay all rent until the ending date of the lease." *Id.* at 4. He acknowledged the agreement of sale provided that he would confirm to Appellees whether he was buying the property by February 1, 2017, and if settlement did not occur by February 28, 2017, all money he had paid toward the purchase price would be non-refundable. *Id.* at 22-23.

However, Appellant indicated it was his understanding that the parties' lease, agreement of sale, and addendum were intertwined, so he could terminate the lease based on inspection contingencies. *Id.* at 7-8. Appellant confirmed he sought to terminate the lease five months before the end date, and prior to giving notice to Appellees, he entered into an agreement of sale for a different property. *Id.* at 5. He acknowledged the $5,000.00 he paid for deposit money to purchase the property also constituted the security deposit under the lease. *Id.* at 24.

He indicated he informed Appellees "many times" before the July 30, 2016, email that he disliked the stucco on the house, and he wanted Hardie Plank on the exterior. *Id.* at 10-12. However, he admitted the parties' agreement of sale specifically provided the stucco would be remediated by October 2015, and it did not provide for a replacement with Hardie Plank. *Id.* at 28. Although he sent Appellees an email indicating he was satisfied with the repairs, he testified the stucco repairs were not a "full stucco remediation." *Id.* at 27. He testified he contacted Appellees to request remediation of all the stucco on the exterior of the house, and Appellees informed him that it was not his house. *Id.* at 138. Appellant testified he did not like the aesthetics of the patchwork stucco. *Id.* at 168.

Appellant noted there was a clause in the agreement of sale providing for an inspection contingency whereby he could be refunded his deposit money if he did not purchase the property. *Id.* at 172. However, he admitted that,

prior to July 30, 2016, when he advised Appellees that he was not going to purchase the property, he had no inspections performed by a certified home inspector. *Id.* at 30-37, 172.

He admitted the first time he complained about a mold issue was in the July 30, 2016, email; however, he testified he had only recently noticed the mold in the basement. *Id.* After he sent the July 30, 2016, email to Appellees, Appellant hired an expert, Steven Yang, to examine the mold in the house. *Id.* at 58. He denied his dogs had fleas, and he testified he did not overflow the washing machine in the basement. *Id.* at 161. He testified that he had seen a snake in the basement, but the snake was not one of his family's pets. *Id.* at 162.

He testified that he wanted Appellees to reimburse him $26,000.00, which is the amount he paid towards the purchase of the property. *Id.* at 163. He noted the problems with the house included water infiltrating the basement, mold in the basement, and patched stucco without a full remediation. *Id.* at 172.

Steven Yang testified he inspected the house and prepared a report on September 22, 2016. *Id.* at 77. He found water damage in the basement. *Id.* at 67. He took swabs and found mold in the basement. *Id.* at 77. He testified that, for an individual predisposed to complications from mold exposure, he "would not feel comfortable" with a person occupying the basement without remediation. *Id.* at 92.

Appellant's wife, Lisa Martin, confirmed the parties' agreements provided the stucco would be remediated. *Id.* at 104. She testified she and Appellant had many concerns about the quality of the work while the stucco was being repaired. *Id.* at 105. She testified Appellant informed Appellees that they were concerned about the quality of the stucco work, and they asked for Hardie Plank to be used on the exterior. *Id.* at 109, 121. She indicated the stucco was not fully remediated. *Id.* at 126. She also testified that, after she and Appellant moved into the house, they discovered mold in the basement, and the mold had been "hidden" by Appellees, who placed a dehumidifier in front of it. *Id.* at 129-30. She testified that neither she nor her husband allowed a washing machine to overflow into the basement. *Id.* at 122.

At the conclusion of the bench trial, by order and opinion entered on April 13, 2022, the trial court entered a verdict in favor of Appellees and against Appellant on all claims in Appellees' complaint, as well as Appellant's counterclaim. The trial court indicated Appellees could file a petition for attorneys' fees within fourteen days. On April 22, 2022, Appellees filed a motion for attorneys' fees[2] and attached an affidavit from counsel in support thereof.

_____

[2] In their motion, Appellees averred that, on August 23, 2016, they commenced an action against Appellant in the Magisterial District Court seeking judgment for breach of the lease agreement, eviction, and monetary
*(Footnote Continued Next Page)*

- 15 -

On Monday, April 25, 2022, Appellant filed a motion for post-trial relief, and on August 22, 2022, the trial court filed an order and opinion denying Appellant's motion for post-trial relief. By order entered on November 30, 2022, the trial court granted Appellees' motion for attorneys' fees and awarded Appellees $24,000.00. On December 9, 2022, Appellant filed a motion for post-trial relief as to the award of attorneys' fees, and by order entered on January 5, 2023, the trial court denied Appellant's motion. On January 26, 2023, the trial court entered judgment in favor of Appellees as follows: unpaid rent-$18,000.00; landscaping-$343.60; and attorneys' fees-$24,000.00. However, the trial court indicated Appellees should return to Appellant the $2,500.00 pet deposit. Thus, the trial court entered judgment in favor of Appellees for $39,843.60. This timely appeal followed, and all Pa.R.A.P. 1925 requirements have been met.

On appeal, Appellant sets forth the following issues in his "Statement of Questions Involved" (verbatim):

(1) Did the trial court err as a matter of law or abuse its discretion in concluding that Buyer did not have the right to terminate the agreement in July 2016?

---

damages. The District Court issued judgment for possession in favor of Appellees, as well as monetary damages. On September 16, 2016, Appellant appealed the Magisterial District Court's decision, and on October 7, 2016, Appellees filed the instant civil complaint. On May 17, 2021, an arbitration hearing was held on the matters. The arbitrator found in favor of Appellees and awarded monetary damages. On June 4, 2021, Appellant filed an appeal from the arbitrator's award, and on March 10, 2022, a bench trial commenced before the trial court.

(2)   Did the trial court err as a matter of law or abuse its discretion in awarding attorneys' fees to the Sellers?

Appellant's Brief at 5-6 (suggested answers omitted).

In his first issue, Appellant contends the trial court erred in concluding his early termination of the lease constituted a breach of the lease. Specifically, he avers that, since the agreement of sale, addendum, and lease were a single integrated contract,[3] he was permitted to terminate the agreement of sale, as well as the lease, based upon inspection contingencies. As such, Appellant contends he was permitted to terminate the lease prior to the expiration thereof because he, as the inspector, discovered incomplete patchwork stucco remediation, as well as mold resulting therefrom in the basement.

Moreover, intertwined in his first issue, Appellant contends he was permitted to terminate the lease because Appellees breached the implied warranty of habitability.  In this vein, he avers the improper patchwork stucco repairs and mold in the basement permitted him to terminate the lease without penalty.  He also suggests Appellees failed to disclose the presence of mold on the seller's disclosure statement, which was a material breach of the lease, thus giving Appellant the right to terminate the lease.

_____

[3] We note Appellees do not dispute the agreement of sale, lease, and addendum are related.  **See** Appellees' Brief at 15-16.  Moreover, the trial court interpreted the lease agreement in light of the provisions contained in the agreement of sale and addendum.

Initially, we note our standard of review is well-settled.

Our review of the trial court's decision after a non-jury trial is limited to determining whether the findings of the trial court are supported by the competent evidence and whether the trial court committed error in the application of law. It is not our role to pass on the credibility of witnesses, as the trial court clearly is in the superior position to do so.

*Ramalingam v. Keller Williams Realty Group, Inc.*, 121 A.3d 1034, 1041 (Pa.Super. 2015) (quotation omitted). "Findings of the trial judge in a non-jury case must be given the same weight and effect on appeal as a verdict of a jury." *Shaffer v. O'Toole*, 964 A.2d 420, 422 (Pa.Super. 2009) (citation omitted).

It is well-established that Pennsylvania courts apply principles of contract law to cases involving residential leases. *See Pugh v. Holmes*, 486 Pa. 272, 405 A.2d 897 (1979). To establish a breach of contract, a litigant must establish: "(1) the existence of a contract, including its essential terms, (2) a breach of the contract; and, (3) resultant damages." *J.F. Walker Co., Inc. v. Excalibur Oil Group, Inc.*, 792 A.2d 1269, 1272 (Pa.Super. 2002).

The interpretation of a contract, such as those at issue in the case *sub judice*, is a question of law. Our standard of review is therefore *de novo*, and our scope of review is plenary. *Vinculum, Inc. v. Goli Technologies, LLC*, --- Pa. ---, 310 A.3d 231, 242 (2024). "In interpreting a contract, the ultimate goal is to ascertain and give effect to the intent of the parties as reasonably manifested by the language of their written agreement." *Humberston v. Chevron U.S.A., Inc.*, 75 A.3d 504, 510 (Pa.Super. 2013) (citation omitted).

- 18 -

> Where the parties, without any fraud or mistake, have deliberately put their engagements in writing, the law declares the writing to be not only the best, but the only, evidence of their agreement. All preliminary negotiations, conversations and verbal agreements are merged in and superseded by the subsequent written contract…and unless fraud, accident or mistake be averred, the writing constitutes the agreement between the parties, and its terms and agreements cannot be added to nor subtracted from by parol evidence.

*Yocca v. Pittsburgh Steelers Sports, Inc.*, 578 Pa. 479, 854 A.2d 425, 436 (2004) (citation omitted) (alteration in original).

Moreover, our Supreme Court has specifically recognized there is an implied warranty of habitability in all residential leases. *See Pugh*, *supra*. This implied warranty of habitability requires "that a landlord will provide facilities and services vital to the life, health, and safety of the tenant and to the use of the premises for residential purposes." *Wilson v. Parker*, 227 A.3d 343, 356 (Pa.Super. 2020) (quotation omitted).

Here, after recognizing the applicable law, the trial court relevantly stated as follows in its opinion denying Appellant's post-trial motions:

> [Appellant] alleges that [Appellees'] failure to replace all of the stucco on the property constituted a breach of the [agreement of sale and lease], which permitted [Appellant] to terminate his obligations thereunder….[Based on] the evidence,…the trial court properly found that [Appellees] completed all stucco remediation that was required under the [parties' agreements]. N.T., 3/10/22, at 71-73.  The [parties'] agreements state that [Appellees] would perform stucco repairs and provide [Appellant] with a contractor's warranty.  More specifically, [Appellees] hired Lunny Environmental to perform inspections and prepare a stucco evaluation report.  [*Id.*] at 55-58.  Rob Lunny performed his inspections and issued a report prior to [Appellant] entering the [parties'] agreements.

- 19 -

[Appellees] then hired Kehs Stucco & Plastering, Inc., which performed the remediation of the stucco based upon the Lunny Report.[1] [*Id.*] at 71-73. [Appellees] provided [Appellant] with a five-year contractor's warranty for the stucco repair work pursuant to the [parties'] agreements. [*Id.*] at 81. [Appellant] never notified [Appellees] that he was dissatisfied with the stucco repair prior to issuing his notice of termination of the [lease] agreement on July 30, 2016. [*Id.*] at 76.

Instead, [Appellant] expressed in an email to [Appellees] dated October 31, 2015, that the stucco contractor "did a great job." [*Id.*] at 81. Furthermore, despite his ability to do so, [Appellant] never requested additional remediation or modification of the stucco work prior to his termination of the [lease] agreement. [*Id.*] at 76. Therefore, the [trial] court properly found that [Appellees] were not in breach of the [parties'] agreements, and [they had] remediated all of the stucco that was required to be repaired thereunder.[2]

---

1 [Appellant] admits that the [parties'] agreements do not specify that the stucco repairs would be completed in accordance with the 2015 IRC Code. Moreover,…[Appellant], who admits he is a contractor, never notified [Appellees] of a problem with the stucco nor requested additional repairs under the five-year contractor's warranty prior to terminating the [lease] agreement. After hearing all of the evidence at trial, [the trial court] specifically found that the stucco repairs were performed reasonably and in accordance with the [parties'] agreements. Thus, [to the extent Appellant argues] with respect to the thickness of stucco required under the 2015 IRC Code, [the argument] is meritless.

2 [Appellant] also argues that Paragraph 18(A) and (B) of the [agreement of sale] require [Appellees] to "maintain the property including but not limited to structures, grounds, fixtures, appliances, and personal property specifically listed in the agreement [of sale] in its present condition, normal wear and tear excepted." Agreement of Sale, executed 8/26/15, ¶ 18(A). [Appellant] argues that the stucco repairs fell short of this requirement and that he was permitted to terminate [the lease] under Paragraph 18(B)[] of the agreement [of sale]. However,…the [trial] court specifically found that the stucco repairs were performed reasonably and in accordance with the agreement.

---

[Also, Appellant] argues that the language of the [parties'] agreements permits him to terminate the [lease] agreement following an unsatisfactory inspection of the property. As an initial

matter, under Paragraph 10 of the Addendum[4] to the Agreement, …[Appellees] correctly argue that [Appellant's] options were to choose not to purchase the property or to request further repairs under the five-year warranty if [Appellant] was unsatisfied with the stucco work, and that the plain language of Paragraph 10 of the Addendum prohibited [Appellant] from re-inspecting the stucco work and terminating the [lease] agreement on that basis.

[Appellant] further argues that his election pursuant to Paragraph 12(C) of the agreement [of sale] to inspect the property's "structural components [including]…water penetration…[and] mold and other environmental hazards…" permitted him to terminate the [lease] agreement when he found mold on the property. However, under that same provision, and contrary to [Appellant's] argument, home inspections pursuant to that Paragraph were required to be performed by a "full member in good standing of a national home inspection association, or a person supervised by a full member of a national home inspection association, in accordance with the ethical standards and code of conduct or practice of that association, or by a properly licensed or registered engineer or architect." [Agreement of Sale, executed 8/26/15, at ¶ 12(C).]

Here, [Appellant] did not present evidence that his experience as a contractor[5] qualified him to perform inspections pursuant to Paragraph 12(C) of the agreement, and [Appellant] did not retain Steven Yang to test the mold levels on the property until after [Appellant] had notified [Appellees] that he was terminating the [lease] agreement. N.T., 3/11/22, at 77. Even if [Appellant was] qualified to perform inspections under Paragraph 12(C) of the agreement, [Appellant] did not do so within fifteen

_____

[4] Paragraph 10 of the Addendum provides:
Buyer will receive a 5-year warranty after stucco repair is completed in Fall 2015. Therefore, Buyers may not re-inspect the exterior materials, fascia, gutters, downspouts or other areas of the home that were covered by the 2015 Inspection Report by Rob Lunny or other work performed and warrantied by Bill Kehrs in 2015.
Addendum, executed 8/26/15, at ¶ 10.

[5] We note that Appellant admitted at trial that he is not a certified home inspector. N.T., 3/11/22, at 37.

days from the date of execution of the agreement as required by Paragraph 13(A).[6] Therefore, [Appellant] breached the [lease] agreement by terminating early and cannot rely upon Paragraph 12(C) as a basis for relieving him from his obligations thereunder.

[Appellant] alternatively contends that the property was uninhabitable due to the presence of mold that he claims developed as a result of the allegedly defective stucco work….Here, the credible evidence presented at trial showed that [Appellant] failed to notify [Appellees] of the existence of mold prior to his notice of termination of the [lease] agreement on July 30, 2016. N.T., 3/10/22, at 142. Indeed,…[Appellant] waited to notify [Appellees] that he believed the property was uninhabitable until his termination of the agreement on July 30, 2016, and [he] did not retain Mr. Yang to conduct mold testing on the property until after [Appellees] initiated a suit for possession on August 23, 2016. [*Id.*]; N.T., 3/11/22, at 77. Thus, [Appellant] cannot invoke the implied warranty of habitability as a means of avoiding his obligations under the [lease] agreement.

Trial Court Opinion, filed 8/22/22, at 3-6 (citations to record omitted) (footnotes added).

Furthermore, in expanding upon the reasons it rejected Appellant's claims, the trial court relevantly indicated the following in its Pa.R.A.P. 1925(a) opinion:

The language of the [parties'] agreements was clear and unambiguous. There was no suggestion during the trial that [Appellant] did not understand the agreements, was misled by the language of the agreements, or that the language in the agreements was ambiguous or unclear. "When the language of a contract is unambiguous, we must interpret its meaning solely from the contents within its four corners…consistent with its plainly expressed intent." ***Seven Springs Farm, Inc. v. Croker***,

---

[6] Paragraph 13(A) of the agreement of sale provides: "The Contingency Period is 15 days…from the Execution Date of this Agreement for each Inspection elected in Paragraph 12(C)." Agreement of Sale, executed 8/26/15, at ¶ 13(A).

- 22 -

748 A.2d 740, 744 (Pa.Super. 2000) [(*en banc*)] (citations omitted)[.]

Under the facts of this case, the lease agreement provided for an 18-month term, starting August 27, 2015, and ending February 28, 2017. The [parties'] agreements required [Appellant] to confirm by February 1, 2017, whether he would purchase the property. If settlement did not take place on February 28, 2017, the [parties'] agreements provided that "all money paid toward the purchase price…shall become non-refundable" (referring to the monthly payments which could have been credited towards the purchase price). Paragraph 23 of the [lease] agreement[7] specifically referenced the possibility of [Appellant] leaving early. Pursuant to that paragraph, [Appellant] was required to notify [Appellees] at least 30 days before termination, and to pay all rent until the ending date of the [lease] agreement.

The unrefuted testimony established that during the term of the lease and while [Appellant] and his wife continued to occupy the premises, he executed an agreement of sale to purchase a [different] house located in New Hope, Pennsylvania. Two days later, on July 30, 2016, [Appellant] advised [Appellees], by email, that he was terminating the lease early and would not be purchasing the property. [Appellant] refused to pay rent starting August 1, 2016, for the remaining seven months of the term, despite the clear language in the lease which required him "to pay all rent until the ending date of the lease."

\*\*\*

[The trial] court concluded that [Appellant's] complaints about the house, which were offered as justification to terminate his [lease] agreement, had no credibility. He initially

_____

[7] Paragraph 23 of the lease relevantly provides:
Tenant may not end this Lease and move out of the Property before the Ending Date of the Lease or any Renewal Term UNLESS Tenant does ALL of the following:
(A) Tenant continues to pay all Rent until the Ending Date of the Lease, or any Renewal Term, or until a new tenant is approved by Landlord and a new lease takes effect, whichever happens first, AND
(B) Tenant gives Landlord at least 30 days written notice[.]
Lease Agreement, executed 8/26/15, ¶ 23(A), (B) (bold omitted).

complimented the workmanship that was performed on the [exterior stucco] to the [house]. His complaint about mold was created after he decided to vacate the premises, and the testing was performed after he vacated the premises. The [trial] court did not conclude that the property was uninhabitable. In fact, the [trial] court concluded that the property was habitable, and if there was any mold, it could have been easily remediated. Clearly, [Appellant] did not vacate the premises because of mold but was merely looking for a justification to avoid paying rent after he vacated the premises.

Furthermore,…the [trial] court…disposed of Appellant's arguments related to the inspection option and right to terminate. Preliminarily, [the trial court] determined that the "plain language of Paragraph 10 of the addendum to the agreement prohibited [Appellant] from re-inspecting the stucco work and terminating the agreement on this basis." The [trial court] found that [Appellant] did not present evidence that he exercised his home inspection option under the contingency of Paragraph 12(C) of the [addendum], and, therefore, [he] cannot rely on Paragraph 12(C) to avoid the obligations of the contracts. The [trial court] specifically found that the qualified inspector Appellant hired to test mold levels was not engaged until after his notice of termination of the agreement, in direct contravention of Paragraph 13(A) [of the agreement of sale], which required Appellant to avail himself of the option to perform inspections within fifteen days from the execution of the agreements, which he did not do.

Trial Court Opinion, filed 3/20/23, at 6-9 (emphasis, citations to record, and footnote omitted) (footnote added).

We find no abuse of discretion or error of law. Under the clear language of the parties' agreements, Appellees and Appellant entered a lease from August 27, 2015, to February 28, 2017, with an option to purchase the property. While the agreements provided Appellant was permitted to not exercise the option to purchase, he was not permitted to simply terminate the lease early without paying the remaining months' rent absent Appellees

finding a new tenant and Appellant giving Appellees at least 30 days written notice. The trial court found neither precedent was met. Moreover, based on the evidence presented during trial, the trial court found Appellees did not violate the implied warranty of habitability. The trial court's factual findings are supported by competent evidence. *See Ramalingam*, *supra*.

In his next issue, Appellant contends the trial court erred or abused its discretion in awarding attorneys' fees to Appellees. Specifically, Appellant contends there is no express language in the parties' agreements, which permits the award of attorneys' fees to Appellees. Further, to the extent there is such language, Appellant contends the agreements are contracts of adhesion since Appellant was not represented by an attorney.

Relevantly, this Court has held as follows:

> The general rule in this Commonwealth is that there is no recovery of attorneys' fees from an adverse party in the absence of an express statutory authorization, clear agreement between the parties, or the application of a clear exception. *Neal v. Bavarian Motors, Inc.*, 882 A.2d 1022, 1032 n. 11 (Pa.Super. 2005)[.] Generally, landlords and tenants can include in a lease any terms and conditions that are not prohibited by statute or other rule of law. The Landlord and Tenant Act of 1951 [neither] specifically provides for the recovery of attorneys' fees nor does it prohibit inclusion of a fee shifting provision in rental agreements. Furthermore, we are not presented with any applicable exceptions to the general rule. Consequently, the validity of a [fee shifting] provision is solely dependent upon contract law. [*See Pugh*, *supra*]. Where the language of a lease is clear and unequivocal, its meaning will be determined by its contents alone in ascertaining the intent of the parties. *Seven Springs Farm, Inc.*, [*supra*].
>
> "An adhesion contract is defined as a 'standard form contract prepared by one party, to be signed by the party in a weaker position, [usually] a consumer, who has little choice about

the terms.'" ***Robson v. EMC Ins. Companies***, 785 A.2d 507, 510 (Pa.Super. 2001)[.] Moreover, our Supreme Court has found that the common-law application of the doctrine of unconscionability is largely consonant with Section 208 of the Second Restatement of Contracts and provides that

> a contract or term is unconscionable, and therefore avoidable, where there was a lack of meaningful choice in the acceptance of the challenged provision and the provision unreasonably favors the party asserting it. ***See Denlinger, Inc. v. Dendler***, 608 A.2d [1061,] 1068 (Pa.Super. 1992)[.] The aspects entailing lack of meaningful choice and unreasonableness have been termed procedural and substantive unconscionability respectively. The burden of proof generally concerning both elements has been allocated to the party challenging the agreement, and the ultimate determination of unconscionability is for the courts. ***See Bishop v. Washington***, 480 A.2d 1088, 1094 (Pa.Super. 1984) [(*en banc*)].

***Salley v. Option One Mort. Corp.***, 592 Pa. 323, 925 A.2d 115, 119-20 (2007).

***Bayne v. Smith***, 965 A.2d 265, 267-68 (Pa.Super. 2009) (quotations and citations omitted).

In the case *sub judice*, the trial court concluded that Paragraph 25 of the lease clearly and unequivocally provides for attorneys' fees in the case *sub judice*. Paragraph 25 relevantly provides the following:

> If Tenant breaches Lease for any reason, Landlord's remedies may include any or all of the following:….Taking possession of the Property by going to court to evict Tenant. Tenant agrees to pay Landlord's legal fees and reasonable costs, including the cost for Landlord and Landlord's agent to attend court hearings.

Lease Agreement, executed 8/26/15, ¶ 25.

Here, in applying Paragraph 25 to the instant matter, the trial court found that Appellees initiated an action demanding possession at the District Court level, at arbitration, and during the proceedings before the trial court. *See* Trial Court Opinion, filed 3/20/23, at 11. The trial court indicated:

> [T]he instant litigation was initiated in the District Court to obtain possession of the property, and all of the subsequent litigation was the result of [Appellant's] appeals, which prevented a final ruling on the issue of [Appellees'] claim for possession. The litigation can be traced back to the District Court's judgment for possession and damages, an arbitration award in Appellees' favor, [and from the trial court's verdict]. Therefore, the award [of attorneys' fees] was proper.

*Id.*

We find no abuse of discretion or error of law. The lease plainly permits the award of attorneys' fees in the case *sub judice*. **See Bayne**, **supra**.

Moreover, we find no merit to Appellant's claim that the fee shifting provision is unenforceable as a contract of adhesion. Appellant's claim of adhesion is based on his assertion that he was not represented by an attorney during the negotiation of the agreements. However, the trial court found that, based on statements Appellant made to Ms. St. Bernard, Appellant was "represented by an attorney during the negotiations process and had a meaningful choice with respect to same."[8] Trial Court Opinion, filed 8/22/22,

_____

[8] Ms. St. Bernard, who is a lawyer, testified that, during the parties' negotiations in 2015, she was aware that Appellant was represented by a real estate agent, and Appellant later told her that he was also represented by a real estate lawyer. N.T., 3/10/22, at 36. She noted that, in the July 30, 2016,
*(Footnote Continued Next Page)*

at 7. We are bound by the trial court's credibility determinations, and therefore, we find no merit to Appellant's claim. ***Ramalingam***, ***supra***.

For all of the foregoing reasons, we affirm.

Judgment affirmed.

Judgment Entered.

*Benjamin D. Kohler*

Benjamin D. Kohler, Esq.
Prothonotary

Date: 7/10/2024

_____

email, Appellant stated he was represented by a lawyer during the parties' negotiations. ***Id.*** at 38. Appellant, on the other hand, denied during trial that he had an attorney during the parties' 2015 negotiations. N.T., 3/11/22, at 172. He acknowledged he stated in the July 30, 2016, email that he had legal representation during this time; however, he testified he "inaccurately" stated this because he was angry, and Ms. St. Bernard kept threatening legal action. ***Id.*** at 173. As indicated *supra*, the trial court was free to make credibility determinations regarding this issue of fact.

In any event, we note the trial court concluded that there is no allegation that the agreements were forced upon Appellant, unreasonably favored Appellees, or that, if Appellant did not have an attorney, he did not have time or the opportunity to obtain an attorney to review same. ***See*** Trial Court Opinion, filed 8/22/22, at 8; Trial Court Opinion, filed 3/20/23, at 6.